NATIONAL BANK OF WASHINGTON *et al., Appellants*, v. EQUITY INVESTORS *et al., Respondents.*

COLUMBIA WOOD PRODUCTS, INC., *Appellant*, v. EQUITY INVESTORS *et al., Respondents.*

JOSEPH F. MACDONALD *et al., Respondents*, v. EQUITY INVESTORS *et al., Defendants*, TRANSAMERICA TITLE INSURANCE COMPANY, *Appellant.*

*Bogle, Gates, Dobrin, Wakefield & Long, Orlo B. Kellogg, Dan P. Hungate,* and *Bettina B. Plevan,* for appellants National Bank of Washington et al.

*David W. Gossard, Jr.* and *Charles S. Wheeler,* for appellant Columbia Wood Products, Inc.

*Torbenson, Thatcher, Burns & McGrath,* by *Richard M. Thatcher,* for appellant Transamerica Title Insurance Company.

*Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, Robert R. Beezer,* and *Fred G. Cook,* for respondent Stepnitz.

*Rauscher & Kiefer, Edward A. Rauscher,* and *Douglas Millard,* for respondents Macdonald et al.

HALE, C.J.—Three separate actions consolidated for trial with a fourth added on the appeal were precipitated by the National Bank of Washington's decision to foreclose its security interest in a 220-unit apartment complex construction project called Crestview West, in Federal Way, Washington. The issues now here on appeal come from the details of financing and constructing the project, and involve (1) a materialman's claim of lien against the property for unpaid lumber, (2) the land sellers' claim that the escrow agent breached a fiduciary duty in the closing, (3) the claim of a guarantor that he should in law be released from his guaranty because the lending bank assertedly mismanaged the loan, and also whether the superior court lost jurisdiction over the estate of one of the defendant guarantors whose death occurred after issue joined and whose estate was admitted to probate in Minnesota and given substituted service, and (4) from a different cause and different parts of the same record but joined in this appeal, the propriety of the trial court's fixing of an upset price and its refusal to confirm the foreclosure sale.

Although we will consider each controversy seriatim, we think it appropriate first to give a summary or overview of the more significant facts developed in these separate cases and then to narrate briefly the events out of which the separate appeals arose.

## General Circumstances

Joseph F. Macdonald, an employee of the Boeing Company, speculated in real estate. The record indicates that, prior to the sale of the property in this case, Macdonald had bought and sold some 12 to 18 parcels of land. Apparently with a speculative eye, Mr. Macdonald and his wife, Marilynn, purchased a parcel of real estate in 1966 for $42,500, and an adjacent parcel in 1967 for $15,000. Both parcels were purchased on real-estate contracts. Three other persons, ostensibly willing to participate in both possible risks and possible gains from the sale of the two parcels, bought into the property as cotenants under a document prepared by Macdonald. The cotenants, G. E. Stein, J. M. Lancaster and L. N. Christian, along with the Macdonalds, constituted what the record describes as the "Macdonald group." Because Macdonald was the participant responsible for several legal documents executed by the group and played a leading role in making of decisions with regard to their property, the group will be referred to as the Macdonald group except where the context requires otherwise.

A different group constituting a limited partnership called Equity Investors, whose general partners were M. Richard Walsh and Brama Construction Company, agreed to buy the Macdonald group property. This limited partnership accordingly entered into two earnest money agreements with the Macdonald group in 1968 to purchase the two parcels of land from them. The first agreement, dated April 22, 1968, provided for a sale price of $168,000; the second, dated June 17, 1968, and by which the property was eventually conveyed, specified a sale price of $160,000. The Macdonald group and Equity Investors signed a contract December 30, 1968, for the sale of these two parcels to the latter.

Equity Investors, then with a purchaser's interest in the property and substantial hope for successful development, obtained an architect's plan and cost estimate for a 220-unit apartment complex requiring long-term financing of ap-

proximately $1.85 million. Then, having acquired a right to possession, Equity Investors began its search for an interim or construction lender. First it approached Seattle Trust and Savings Bank, but that lender declined to advance the requested funds. Another try, to the National Bank of Washington, was successful, and in April, 1969, Equity Investors' application for a $1.75 million loan for the construction of the apartment house complex was granted.

At this point, a year after the original earnest money agreement between the Macdonald group and Equity Investors had been signed, in order to put Equity Investors in a better position for obtaining a loan, the parties to the real-estate contract decided that the contract of sale would be terminated, and that the land would pass to Equity Investors subject to a deed of trust designating Macdonald as beneficiary. This transaction, it was agreed, would be effected at the same time the construction loan and security interest agreement between National Bank of Washington and Equity Investors was to be closed. Transamerica Title, designated by the parties as escrow agent for the transfer and loan, was also the insurer of title for the lender, National Bank of Washington.

In conversations with Equity Investors and in a rider to the deed of trust naming Macdonald as beneficiary, Macdonald and Equity Investors, in order to facilitate the loan for Equity from the National Bank of Washington, agreed that Macdonald's otherwise prior interest would be subordinate to the security interest of the bank; certain other conditions not here pertinent were additionally to be performed by the parties to that agreement. Macdonald prepared his own escrow instructions to Transamerica and insisted that all documents relative to the sale and escrow be examined by his attorney, a Mr. Best, who did examine many of the documents for him. The trial court, in one of these consolidated cases, held Transamerica liable, however, for breach of fiduciary trust and for negligence when a Mr. Stenesen, a Transamerica employee, submitted to the Macdonald group for their individual signatures a form of

agreement expressly and unconditionally subordinating their interests to those of the bank. Mr. Stenesen at the time told Macdonald that the instrument was needed for closing but did not advise Macdonald of the document's legal effect nor suggest that he see his attorney about it. This document, called a subordination agreement, was later returned by Macdonald to Transamerica with his signature and that of his wife; subsequently, it was individually signed by the other members of the Macdonald group. It contained subordinating language similar to that of the rider to the earlier second deed of trust which they similarly had signed, but was phrased in language purporting to make the subordination unconditional and categorical.

In this phase of the action between the Macdonald group and Transamerica, the trial court found that the Macdonald group would have refused to go through with the deal if the only alternative were an unconditional subordination agreement, and awarded the Macdonald group damages from Transamerica. The trial court found that, although Transamerica intended to make the subordination unconditional, had Macdonald understood its absolute and unconditional legal effect he would not have acquiesced in signing the document which, as noted, provided for an unconditional rather than a conditional subordination. The bank's instructions to Transamerica, as escrow agent, explicitly required that its interests be unconditionally prior and superior to all other security interests before advancing. The court, however, found the Macdonald group was unaware of the bank's requirement. Transamerica's employee, Stenesen, testified by deposition, and the court, as a basis for recovery by Macdonald against the escrow holder, found that the unconditional subordination agreement had been prepared by Transamerica for its own benefit as title insurer for the bank. The escrow and financing deal closed on May 14, 1969, and construction of the apartment house project commenced.

Another phase of the deal produced a lien priority case. Brama Construction, Inc., and Equity Investors selected

Columbia Wood Products, Inc., as one of the lumber suppliers. Columbia began furnishing material May 26, 1969, and some 4 months later, September 15, 1969, filed a claim of lien for materials delivered and unpaid for. It notified the bank, as disbursing agent for the project, that a part of its claim was unpaid and owing. The amount of that claim came to $119,672, plus interest and attorneys' fees of over $28,000.

Then, in a phase of the case giving rise to the guaranty issue on appeal, the bank, in October, 1969, refused to make a progress advance until the percentage of moneys advanced was brought into line with the percentage of construction completed. Only 63 percent of the project had been then completed, but with the advance in question the loan would have been 65.6 percent advanced. The two figures were made to substantially coincide, however, with the infusion of an additional $75,000 advanced by one Walter Stepnitz as further capital. At this time, the bank's cost projections indicated the total cost of the project would run to about $1,988,467, more than $200,000 in excess of the original estimate.

By December 16, 1969, the National Bank of Washington had advanced $1,386,659.21 of the total loan. It had obtained earlier a guaranty agreement from several persons as a condition to granting the loan whereby the guarantors agreed to hold the bank harmless in the event that the bank was not fully repaid by the long-term lender. In accepting the guaranty, the bank looked to the solvency and apparent capabilities of the guarantors of payment of the loan, Richard and Gloria Walsh, Brama Construction, Inc., and Richard L. and Eileen Brama. The Bramas had been regarded as the principal managing force in the operation of Brama Construction; they aspired, however, to be released from the guaranty agreement. Accordingly, on December 16, 1969, at a time when the bank had paid out more than 75 percent of the original loan funds, and construction was months behind schedule and cost overruns were apparent, the parties, except for the Bramas, executed

a new guaranty agreement. In this second guaranty, the Walshes, Brama Construction, Inc., and Walter and Evelyn Stepnitz signed as guarantors. This new guaranty described the signatories as "new guarantors;" its purpose, so far as pertinent here, was to substitute the Stepnitzes for the Bramas as guarantors although the entire agreement, of which it was a part, constituted a substantial revision of the initial documentation of the project.

After the execution of the new guaranty, it became apparent that the amount to be loaned would be markedly inadequate for completing the project because substantial cost overruns appeared inevitable. Advances were made on December 30, 1969, and January 7 and February 9, 1970, by the bank—but after the February advance the bank refused to pay out any more money. Of its original loan commitment of $1,750,000, it had paid out $1,742,678.63. Of the $1.85 million total loan account as subsequently enlarged, only $107,000 remained to be disbursed and the estimates of cost to complete ranged then from $135,000 to $150,000. The ultimate cost overrun found by the trial court was about $350,000.

Many events then occurred in rapid succession. The National Bank of Washington commenced suits for recovery of its interests. It began a foreclosure suit and an action against Walter and Evelyn Stepnitz as guarantors. Walter Stepnitz died during the pendency of the action. Approximately 1 week before the date of trial, Stepnitz' estate in Minnesota was given service of process. Evelyn Stepnitz, Walter Stepnitz' widow, remains a party to the action.

In addition, Columbia Wood Products commenced an action to foreclose upon its materialman's lien, and the Macdonald group interests, now realizing the unconditional nature of the subordination agreement they had all signed, brought action against Transamerica, the escrow agent, alleging a breach of fiduciary duty and claiming that this breach caused a loss of priority in the foreclosure action to the Macdonald group's damage.

All these actions were consolidated at trial, and are here

for review under consolidated cause No. 42264. In addition, following the foreclosure sale, the trial court refused to confirm the highest bid in the amount of $1.88 million submitted by the bank. Rather, the court set an upset price and indicated that it would confirm a bid of approximately $2.247 million unless the bank would waive its deficiency judgment. The bank appeals that determination under separate cause No. 42354.

Because the various parties are directly affected by different segments of the case, we will consider separately the positions of the parties with reference to each other: First, Columbia Wood Products vis-a-vis National Bank of Washington; second, Macdonald group vis-a-vis Transamerica Title Company; and third, National Bank of Washington vis-a-vis the Stepnitz interests, first as to the effect and validity of the guaranty agreement, and then the confirmation of sale issue. Such additional facts as we believe essential to a resolution of the particular questions of law will be presented in connection with each question.

### Columbia Wood Products, Inc., Vis-a-vis The National Bank of Washington

Columbia Wood Products, Inc., furnished lumber for the apartment house project, commencing deliveries to the site May 26, 1969, and continuing to about August 5, 1969. As earlier noted, it received partial payment, but when construction came to a halt there was still due and unpaid the sum of $119,672 for material sold, delivered and utilized in the nearly completed buildings. The trial court awarded Columbia Wood Products, Inc., a judgment of $119,672.26 on this unpaid bill, with 12 percent accrued interest from September 5, 1969, in the amount of $28,721.34, and statutory costs. The court decreed, however, that Columbia Wood Products' judgment lien be subordinate and junior to the lien of National Bank of Washington's deed of trust to the extent of all advances made by that bank on its loan for the construction of the apartment house complex. Columbia Wood Products appeals that part of the judgment and decree which rendered its materialman's lien inferior and

junior to the bank's total secured loan advanced for the construction.

Columbia Wood Products' lien was declared inferior to the entire amount of the bank's advances on a theory that the National Bank of Washington possessed a prior and superior deed of trust lien in effect before and continuing during the delivery of the lumber. According to the bank's theory, its priority was established as of about May 9, 1969, when Transamerica filed the trust deed of Equity Investors, a limited partnership, naming the National Bank of Washington as beneficiary, securing a promissory note in the amount of $1,850,000—all in accordance with a construction loan agreement of May 7, 1969, between the National Bank of Washington as lender and Equity Investors as borrower. As work on the project progressed, the bank advanced the funds. On May 8, 1969, the bank delivered in escrow $211,000 to Transamerica Title Insurance Company for disbursement according to the bank's escrow instructions and as agreed upon by Equity Investors and the Macdonald group. Under the various agreements, the bank paid out the loan funds in segments or advances as the construction progressed until it had reached a total loan of $1,742,678.63, nearly the agreed maximum.

Columbia Wood Products began deliveries of lumber to the project on May 26, 1969, and continued supplying material until August 5, 1969, but with the last delivery there was, as earlier noted, still due and unpaid on the lumber bill some $119,672. Its claim of a lien superior in part to that of the National Bank of Washington is based on the contention that the advances made by the bank under the construction loan agreement as the work progressed were optional advances and could not have been legally enforced against the bank.

The issue, we think, is appropriately stated by respondent bank in its brief, as follows:

> The issue raised on appeal by Columbia Wood Products, Inc. is whether or not the loan advances made by respondents National Bank of Washington and General

Mortgage Investments (referred to herein as "respondents" or "lenders") to the borrower, Equity Investors, were entitled to priority as against appellant's materialman's lien claim. Appellant contends that respondents' loan advances were optional and not obligatory and that the advances were entitled to priority only as of the date on which they were made. Respondents contend, and the trial court ruled, that the advances were obligatory under the Construction Loan Agreement between respondents and Equity Investors and that the advances were entitled to priority as of the recording date of the Deed of Trust from Equity Investors to respondents.

Were the advances as made by the National Bank of Washington optional? Or, could the bank have been compelled by the courts to make them? If they were optional, then under the principles adopted by this court, Columbia Wood Products' lien for lumber delivered and utilized in the apartment house project should be superior to that of the bank's deed of trust insofar as advances made subsequent to the materialman's perfected lien are concerned. If the bank, however, under the construction loan agreement could have been compelled in the courts to advance the moneys on the loan, then its lien is totally superior and prior to that of Columbia Wood Products.

■■ We think that Columbia Wood Products' contention is sound and that for the purpose of determining lien priorities the advances were in law optional. In the construction loan agreement, the bank made such explicit reservations for the disbursement of the loan as, in our judgment, render the advances of $1,750,000 optional and not obligatory at law. Although such reservation of discretionary authority appears to be a sound banking practice and designed to protect the financial interests of the party to the project which would wind up with the greater sum of money in it, these protective reservations operated, in law, we think, to subordinate the bank's lien for undelivered advances to those of the materialmen and workmen whose work, services and materials went into the project to enhance the bank's security. It has, we realize, long been the

rule in this jurisdiction that a mortgage to secure future advances takes priority over mechanics' and materialmen's liens accruing after recordation of the mortgage (*Home Sav. & Loan Ass'n v. Burton,* 20 Wash. 688, 56 P. 940 (1899)), but there is a well-established corollary to the rule that, if under the contract the advances are optional and not obligatory, then the lien priority for the advances is determined as of the time the advances are actually made.

What made the advances optional in law rather than obligatory? The very terms of the construction loan agreement gave the bank discretion as to which of the subcontractor materialmen would be paid from the advances. The construction loan agreement contained a promise to lend Equity Investors the $1,750,000 "upon the terms and conditions set forth below." This agreement provided that, after deducting all fees, charges and expenses agreed to by the borrower, the remaining proceeds of the loan would be credited to the borrower's construction loan account in the lending bank. Thus, the advances were not to be delivered over to the borrower but would remain on deposit in the lending bank as the contract stated to "finance the construction of apartment buildings on property described in the Deed of Trust."

The construction loan agreement specified that, prior to the first advance of construction funds, the bank was to be supplied with a current appraisal satisfactory to it; that all loan funds must be used for payment of material and labor; and that the loan proceeds were to be assigned by the borrower to the bank for that purpose. The borrower, according to this agreement, had to retain an architect satisfactory to the bank, and this approved architect had to supply the bank with periodic progress of construction reports, and before each advance of loaned money certify that satisfactory progress had been made and in the future would be made in keeping with the remainder of the unexpended loan.

The construction loan agreement left the loan moneys

largely under the control and dominion of the bank, *"to be advanced at such times and in such amounts as the Lender shall determine."* It provided, too, that *"No advance shall be due unless, in the judgment of the Lender"* all work for which the advance had been made had been done in a good and workmanlike manner, and unless the construction be approved by the architect. The lender, at his option, could advance and pay the loan installments before they became due, if he deemed it advisable to do so—but all such advances were to be treated as a performance of the agreement and not a modification of it. Also, according to the construction loan agreement, the lender was not obligated to disburse more than 90 percent of the loan until the construction was completed and the property free of liens and claims of all kinds except the lender's lien.

There were other provisions in the construction loan agreement, giving control over the funds to the bank, including:

> If the construction of said building be at any time discontinued or not carried on with sufficient dispatch in the judgment of the Lender to protect the building from depredation or the weather, said Lender may purchase materials and employ workmen to protect the building so that the same will not suffer from depredation or the weather, or to complete said building, so that it may be used for the purposes for which it was designed under the said plans and specifications.

Accordingly, the disbursements of funds by the bank under an agreement placing discretionary controls in the lender over the disbursement of the loan funds with an additional reservation that the loan is "to be advanced at such times and in such amounts as the Lender shall determine," we think left so wide an area of discretion in the bank as to render the amounts to be advanced and the intervals of their advancing optional rather than compulsory as a matter of law. Had the borrowers sought a decree to overcome these reservations and to compel the advances, or to override the bank's discretionary power to advance or withhold the loan funds, they would have met with nearly

insuperable obstacles at law. So broad and yet so specific were the bank's discretionary powers under the contract as to the times and amounts of the advances, a court could not properly override such discretion without abrogating the contract.

Although in a given case there may be difficulty in ascertaining from the circumstances and the language of the mortgage and loan papers covering the whole agreement whether the advances are to be regarded as optional or mandatory, we think that the contractual reservations giving the lender the broad discretion of deciding when and in what amounts, *or if at all*, he must advance the money render the advances optional rather than obligatory where the purpose is to decide construction lien priorities arising after the initial filing for record of the lender's security documents. As a means of protecting its security, the lender retained broad discretionary powers to determine under what circumstances it would advance the money, to withhold the advances any time that it believed its security in jeopardy or doubted the sufficiency or quality of the construction work or felt that an impending insolvency on the borrower's part would threaten the completion of the project or repayment of the loan. There was no hard and fast commitment to deliver the loan money over to the borrower at a given and stated time, nor to advance the money at more or less fixed intervals and in stated amounts. The lender, in reserving such broad protective discretion, thereby rendered the advances optional rather than obligatory for the purpose of determining the priority of liens.

Thus, we are adhering to what we perceive to be the weight of authority embodied in the rule that, where the advances of promised loan moneys are, under an agreement to lend money, largely optional, that is, where the time and the amount of the moneys to be advanced are largely discretionary in the lender, the legal effect of such provisions is to bring the transaction under the rule for optional advances rather than the rule governing mandatory advances for the purpose of determining lien priorities. Optional ad-

vances under a construction loan agreement attach when the advances are actually made. Any liens attaching prior to an optional advance would thus be superior to it, and attaching afterwards, junior to it. *Elmendorf-Anthony Co. v. Dunn,* 10 Wn.2d 29, 116 P.2d 253, 138 A.L.R. 558 (1941); *Kimmel v. Batty,* 168 Colo. 431, 451 P.2d 751 (1969); *Peterson v. John J. Reilly, Inc.,* 105 N.H. 340, 200 A.2d 21 (1964); *Lyman Lamb Co. v. Union Bank,* 237 Ark. 629, 374 S.W.2d 820 (1964).

A contrary rule on that point would allow a lender, having power to allocate the loan moneys in such a way as to insure that those whose work, materials and efforts serve to enhance the value of the security, to sit idly by and watch his security grow, while at the same time potentially leaving the materialmen, subcontractors and workmen in the position of doing their work and supplying materials for little or nothing. The rule here contended for by lender would lead to an inevitable unjust enrichment, enabling the lender to withhold or apply the loan money as he saw fit, all the while knowing that putative lien claimants were furnishing valuable materials and doing valuable work to the enhancement of his security. The bank here had the option of withholding its advances on the loan from the borrower, and the right to apply the money to the account of Columbia Wood Products in payment of the lumber that company was delivering to the construction project.

The rule of optional loan advances for the resolution of construction and security and lien priorities has classic application here, and we would, therefore, apply the principles of *Elmendorf-Anthony Co. v. Dunn, supra.*

This court referred to *Elmendorf* and adhered to this rule in *Cedar v. W.E. Roche Fruit Co.,* 16 Wn.2d 652, 134 P.2d 437 (1943). In *Cedar,* we affirmed the principle of optional advances, but found it inapplicable to a contract to finance and make future advances to be expended in planting, growing and harvesting a fruit crop. In that case, while recognizing the distinction between obligatory and optional advances, we held the advances promised were not, under

the agreement, optional but rather were obligatory. In the instant case, however, the lending bank's duty to make the advances was dependent to such a degree upon so many conditions, the occurrence of which lay within its judgment, that it had the option throughout the construction either to pay the materialmen, mechanics and subcontractors from the loan funds or to retain the loan funds within its control, or to deliver the loan funds over to the borrower. The advances being thus optional, they became subject to intervening liens accruing with the lender's knowledge and acquiescence. *Elmendorf-Anthony Co. v. Dunn, supra; Cedar v. W.E. Roche Fruit Co., supra. Accord, Keltch, Inc. v. Don Hoyt, Inc.,* 4 Wn. App. 580, 483 P.2d 135 (1971). *See also,* in support of this principle, *Home Sav. & Loan Ass'n v. Sullivan,* 140 Okla. 300, 284 P. 30 (1929), and *Akron Sav. & Loan Co. v. Ronson Homes, Inc.,* 15 Ohio St. 2d 6, 238 N.E.2d 760, 80 A.L.R.2d 179 (1968).

Accordingly, the judgment and decree of the trial court on the claim of Columbia Wood Products, Inc. is reversed.

Transamerica Title Insurance Company
Vis-a-vis The Macdonald Group

In this action, the superior court granted Joseph F. and Marilynn C. Macdonald, G. E. Stein, J. M. Lancaster and L. N. Christian, cotenants in the real estate (the Macdonald group), judgment in the sum of $104,178.12, plus interest, costs and attorneys' fees against Transamerica Title Insurance Company. This judgment was awarded on plaintiff Macdonald group's claim that, while participating in arrangements for the sale of the land to Equity Investors and the subsequent construction loan, it was a victim of Transamerica's asserted breach of fiduciary obligation as an escrow agent and negligent handling of the escrow.

Joseph F. Macdonald and his wife by contract had purchased the project real estate in two parcels, the first in 1966 for $42,500, and the second in 1967 for $15,000, making a total purchase price obligation of $57,500. The Macdonald group, as cotenants in the real estate, after an intermediate

agreement to sell, not relevant here, sold the real property through Joseph Macdonald to Equity Investors for about $160,000 on December 30, 1968, payable under a contract which called for payments of $1,000 per month. Equity Investors, a limited partnership, consisting of Richard Walsh and Brama Construction, Inc., as general partners, arranged with Central Savings Bank to purchase a first mortgage loan which the parties assumed would ultimately be made by another finance institution for the construction of the 220-unit apartment complex upon the property. On completion of the project in accordance with this series of agreements—which we have described only in part—the Macdonald group would finally receive about $165,810.34 for the same property which they had acquired in 1966 and 1967 at a price of $57,500.

In April, 1969, Equity Investors and Macdonald established an escrow with Transamerica Title Insurance Company as escrow holder and at that time left with Transamerica a set of escrow instructions dated April 25, 1969, that explicitly stated they would become void after May 10, 1969. These escrow instructions contemplated that an irrevocable security be established to protect the financial institution which would ultimately undertake to make the construction loan. Equity Investors, to secure the Macdonald group's interests in the real estate, had executed as grantors what was designated a second deed of trust, dated December 31, 1968, to Transamerica as trustee, naming the Macdonald group as beneficiaries. Attached to this second deed of trust was a rider signed by Equity Investors as grantor, Transamerica Title as trustee, and individually by members of the Macdonald group as beneficiaries, which stated that the second deed of trust was "subject to a First Mortgage (or First Deed of Trust) running to National Bank of Washington . . . in the original amount of $1,850,000.00. Beneficiaries agree that this document shall not be placed of record until the said First Mortgage has been duly recorded." The Macdonald group thus had actual knowledge that no money would be loaned by the National

Bank of Washington, and its associates, unless the Macdonald group's interest in the land was explicitly made subordinate in some manner to the lender's interests.

This second deed of trust and attached rider were filed for record May 15, 1969, at the office of the county auditor at the request of Transamerica Title Insurance Company, some 5 days after the first set of escrow instructions left by Macdonald were to become void. The basic question, thus, is whether Macdonald knew, or should be charged as a matter of law with knowing, that the bank would not proceed to advance the loan under the construction loan agreement unless its security was unconditionally superior to that of the Macdonald group.

On May 7, 1969, 3 days before the first set of instructions left by Macdonald and Equity Investors with Transamerica was by its terms to become void, Mr. Macdonald read the construction loan agreement in which the National Bank of Washington agreed to lend Equity Investors $1,750,000 for the construction of the apartment house complex. This construction loan agreement stated, like the rider to the second deed of trust, that the loan was to be "secured by a Deed of Trust which shall be a first lien on the *unencumbered, marketable,* fee simple, absolute title to the property." (Italics ours.) As a matter of law, this language, we think, must be deemed clear, definite and certain; it unmistakably declares that the bank did not intend to and would not lend $1,750,000 for the construction of the apartment house complex unless its loan was to be a first and absolutely prior lien upon the property.

Mr. Macdonald thus, with knowledge of the contents of the rider and the construction loan agreement, met his attorney, Mr. Best, at the Transamerica office, where the attorney, on Mr. Macdonald's behalf, examined the escrow instructions and other papers in connection with the escrow. Macdonald's attorney required certain changes to be made in the deed of trust and rider thereto, and had Macdonald execute the papers. These escrow instructions which

Macdonald then signed were directed to Transamerica as escrow holder, and provided that the Macdonald deed of trust should be filed for record later than the mortgage which would be given to secure the construction loan. And, as noted, the rider to the Macdonald deed of trust contained conditions as to its subordination.

May 12, 1969, the National Bank of Washington delivered to Transamerica Title Insurance Company its escrow instructions specifying that the deed of trust which the bank held as security for the $1,750,000 loan—with option for an increase of $100,000—must become a first and prior lien upon the property. Transamerica at that time as escrow agent held a deed of trust from Equity Investors to the bank, dated May 6, 1969, which it had recorded at the county auditor's office May 9, 1969. To effectuate the bank's categorical condition that its security interests be a first and prior lien and to comply with the bank's escrow instructions and at the same time confine its liability as the insurer of the bank's title, Transamerica prepared the subordination agreement form now before us for signature by the Macdonald group.

It was the execution of this subordination agreement form by the Macdonald group on May 14, 1969, that provided the basis for awarding plaintiffs judgment on the theory of a breach of fiduciary trust. Mr. Randy Stenesen, Transamerica escrow officer, after preparing the form, called plaintiff Macdonald on the telephone to tell him that the closing papers were ready at Transamerica's office. Mr. Macdonald went to Transamerica's office where Mr. Stenesen told him that Transamerica would have to have the escrow instructions signed, and handed him the subordination agreement purporting to make the Macdonald group's lien on the real estate unconditionally inferior and junior to that of the National Bank of Washington's lien for the loan. Mr. Stenesen did not advise Mr. Macdonald as to the legal effect of the two instruments, nor did he otherwise counsel him about the transaction, or advise him that the effect of

the documents in any way differed from the prior agreement of the parties. Mr. Stenesen did make clear, however, that the escrow arrangement depended upon the documents being signed and returned to Transamerica, and he left no doubt that the entire escrow would not be consummated without them.

Mr. Macdonald took the proposed escrow instructions and the subordination agreement to his home and without consulting his attorney, Mr. Best, or any other attorney, had his wife sign them and returned them several hours later that day to the Transamerica office. Subsequently that same day, two other members of the Macdonald group went to the Transamerica office and signed the escrow instructions and the subordination agreement. The Macdonald deed of trust was recorded May 15, 1969, after the recordation of the bank's deed of trust on May 9, 1969.

The Macdonald group claimed damages against Transamerica on the theory that Transamerica had breached its duties as a fiduciary by exceeding its authority as an escrow agent, had changed the nature of the transaction to their detriment and damage, and had negligently failed to protect their interests in the escrow as ultimately arranged.

Construction was brought to a halt before the project reached completion, leaving many construction liens unpaid. In resolving the numerous claims of priority following the halt of construction, the trial court held that the Macdonald group's deed of trust was junior and inferior to that of the National Bank of Washington and, thus, their interest in the land forfeited by operation of law.

In Macdonald's suit against Transamerica, the trial court sustained the Macdonald contentions of breach of fiduciary duty and negligence and awarded them judgment against Transamerica. The execution of the subordination agreement and second set of escrow instructions explicitly laid to rest any possible attack the Macdonalds could make against the priority of the bank's lien. Damages were awarded these plaintiffs against Transamerica in lieu of their claimed loss of priority to the bank. In essence, the

court held that not only had Transamerica been negligent, but that it had breached a fiduciary duty in failing to point out to Macdonald the legal operation and effect the escrow instructions and subordination agreement would have as to the priority of their deed of trust against the bank's deed of trust. The award of damages was based, *inter alia,* upon finding No. 48[1] which we think a mixed finding of fact and conclusion of law.[2]

Joseph F. Macdonald was no novice in dealing in land, nor were the other three members of the Macdonald group completely uninitiated. The four, all engineers, had worked together at the Boeing Company, and prior to the instant transactions had purchased about 181 acres of land near Portland, as an investment for future resale. Joseph F. Macdonald, nominal head of the group, had made several purchases of land—amounting to about 12 parcels—prior to acquiring an interest in the property at issue in this case. He had read books on real-estate investment and had actually drafted documents in connection with real-estate transactions. In the present case, he had actively participated in the drafting of the second earnest money agreement, a real-estate contract, the escrow instructions, and

---

[1]Finding of fact No. 48:

"Transamerica's conduct as escrow agent damaged the MacDonald co-tenants by, first, introducing into the closing transaction the form subordination agreement (plaintiff's Exhibit 20) which had the effect of abrogating the earlier negotiated conditions to subordination of which Transamerica was aware; and second, having introduced said form subordination agreement, presenting it for execution by the MacDonald co-tenants and causing it to be recorded without any explanation to the co-tenants of the reasons for its introduction, or its effect, and without any precautionary measure to insure that the effect of said form agreement would be understood by the MacDonald co-tenants or reviewed by MacDonald's attorney. By said conduct, Transamerica breached its contractual obligations to the MacDonald co-tenants; and further breached its fiduciary obligations to said co-tenants. Apart from said breaches, Transamerica's said conduct was negligent."

[2]In disposing of the various issues of fact and law, the court made some 134 findings of fact and 64 conclusions of law running to 79 pages. But, in so many of them there is such an admixture of fact and law that the operative facts perforce must be gleaned from the entire record.

helped draft a rider to the deed of trust similar to the rider to exhibit No. 8. He acknowledged on the witness stand that he made a practice of reading carefully all legal documents in which he had an interest.

There was no claim made that anyone connected with Transamerica had committed any fraud or deceit upon or made misrepresentation to or overreached the Macdonald group. Liability was predicated, as we understand the record, upon a composite breach of duty to alert them to the changes made by the proffered documents, and to inform them of the legal effects of the subordination agreement and the escrow instructions—the very documents which Macdonald had taken to his home for his wife's signature and returned hours later to Transamerica's office. It was the failure to advise and counsel Macdonald that the trial court regarded as a breach of fiduciary duty.

We think that the facts as found by the court do not warrant a conclusion of either negligence or breach of fiduciary duty. The Macdonald group was fully advised that the National Bank of Washington would not lend the $1,850,000, or thereabouts, except upon a bedrock assurance that its security constituted a first, senior and prior lien to that of any other titleholders or claimants. The Macdonald group, as we have noted, had earlier individually signed an instrument (plaintiff's exhibit No. 8) entitled "Second Deed of Trust," dated December 31, 1968, in which Equity Investors, as grantor, conveyed through Transamerica Title Insurance Company, as trustee, to the Macdonald group as beneficiary, the real property in issue. This second deed of trust had a rider annexed to it which declared expressly that the Macdonald group's interests would be junior and inferior to that of the lending bank. This rider, signed individually by Joseph F. and Marilynn Macdonald, G. E. Stein, J. M. Lancaster and L. N. Christian, by his attorney in fact, George E. Stein, in express language subordinated the Macdonald group's interests to those of the bank. The rider annexed to the second deed of trust stated that it would be

> Subject to a First Mortgage (or First Deed of Trust) running to National Bank of Washington, Tacoma, Washington, and/or Central Savings Bank of New York, N. Y. and/or their assigns, in the original amount of $1,850,000.00. Beneficiaries agree that this document shall not be placed of record until the said First Mortgage has been duly recorded.

The escrow instructions, signed by both Joseph F. and Marilynn C. Macdonald, and G. E. Stein and L. N. Christian, through his attorney in fact George E. Stein, stated that:

> The undersigned authorizes Transamerica Title Insurance Company to record said Deed of Trust and agrees to pay for Mortgagee's policy insuring said Deed of Trust to be Second only to that certain Deed of Trust to National Bank of Washington.

Finally, the instrument—the subordination agreement—which categorically declared the bank's interests to be prior and senior to those of the Macdonald group and subordinated the Macdonald group interests in the real property to that of the bank's, made its purpose and legal effect clear in unmistakable definitive language. This was the subordination agreement form handed to Mr. Macdonald by Transamerica's representative, Mr. Stenesen, at Transamerica's offices when Transamerica's Mr. Stenesen informed Mr. Macdonald that the escrow could not be closed without it. That instrument, when executed, on its face served to carry out the very subordination of interests which had so markedly characterized the earlier instruments.

Mr. Macdonald, as noted, took this from Mr. Stenesen to his home where he had it in his possession several hours before returning it to Transamerica with his and his wife's signatures affixed to it. He did not, as he had done on earlier occasions with respect to other escrow papers and documents related to this transaction, submit it or the escrow instruction documents to his attorney, Mr. Best, nor seek his or any other attorney's advice or counsel with respect to them.

The language of the subordination agreement, a 1-page

instrument, was clear, definite and explicit. Not surprisingly, it was entitled in bold, black type at top center "Subordination Agreement." Under this caption in three lines of nearly equal size to that of the title, and much larger than the type of the body of the instrument was this caveat:

NOTICE: THIS SUBORDINATION AGREEMENT RESULTS IN YOUR SECURITY INTEREST IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.

And just above the dotted lines for the signatures in type as large as that of the first notice, was this final caveat:

NOTICE: THIS SUBORDINATION AGREEMENT CONTAINS A PROVISION WHICH ALLOWS THE PERSON OBLIGATED ON YOUR REAL PROPERTY SECURITY TO OBTAIN A LOAN A PORTION OF WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN IMPROVEMENT OF THE LAND. IT IS RECOMMENDED THAT, PRIOR TO THE EXECUTION OF THIS SUBORDINATION AGREEMENT, *the parties consult with their attorneys with respect thereto.*

(Italics ours.) These two caveats and the title "Subordination Agreement" were of such a size type as to occupy nearly one-third of the space taken up by the body of the entire 1-page instrument. It was signed, as we have observed, by Macdonald, his wife and the three other members of the Macdonald group.

No person of ordinary understanding, even on a most cursory examination, could possibly have mistaken the subordination agreement's import, nor questioned that it put the Macdonald group's interests in the land in a position junior and subordinate to the interests of the National Bank of Washington. Where, then, was the breach of fiduciary duty, or negligence, upon which liability was found?

■ We agree with the rules as stated by the Macdonald group defining the characteristics and governing the responsibilities of escrow holders. An escrow holder is an agent. *Radach v. Prior,* 48 Wn.2d. 901, 297 P.2d 605 (1956); *Angell v. Ingram,* 35 Wn.2d 582, 213 P.2d 944, 15 A.L.R.2d 865 (1950); *Sanwick v. Puget Sound Title Ins. Co.,* 70

Wn.2d 438, 423 P.2d 624, 38 A.L.R.3d 315 (1967). Whether he be designated escrow agent or escrow holder, or both, makes little difference in law; the important thing is that as an agent, holder, or trustee for the parties (28 Am. Jur. 2d *Escrow* § 1 (1966)), he occupies a fiduciary relationship to all parties to the escrow. As an agent, trustee or holder, the escrow holder owes a fiduciary duty to his principals in the same way that all agents are held to such standards. *Cantwell v. Nunn,* 45 Wash. 536, 88 P. 1023 (1907); *Westerbeck v. Cannon,* 5 Wn.2d 106, 104 P.2d 918 (1940); 28 Am. Jur. 2d *Escrow* § 16 (1966); Restatement (Second) of Agency § 14 D, Reporter's n., Appendix (1958).

The escrow agent's duties and limitations are defined, however, by his instructions. The rule on this point is well stated at 30A C.J.S. *Escrows* § 8 (1965):

> The duties of a depositary or escrow holder are those set out in the escrow agreement. . . . As a general rule, the escrow holder must act strictly in accordance with the provisions of the escrow agreement; he must comply strictly with the instructions of the parties, and it is his duty to exercise ordinary skill and diligence, and due or reasonable care in his employment. In his fiduciary capacity, he must conduct the affairs with which he is entrusted with scrupulous honesty, skill, and diligence.

Thus, it is the rule that an escrow agent or holder becomes liable to his principals for damage proximately resulting from his breach of the instructions, or from his exceeding the authority conferred on him by the instructions. *Sanwick v. Puget Sound Title Ins. Co., supra; Kirby v. Woolbert,* 48 Wn.2d 141, 291 P.2d 666 (1955).

The damages were awarded here solely upon a claim of negligence and breach of fiduciary duty. When narrowed down to the acts or omissions upon which the claim was based, it consisted of submitting to Mr. Macdonald a new set of escrow instructions to replace the first set which he had prepared but which had expired by their very terms, and in handing him the subordination agreement for the signatures of the members of that group without orally

advising him of its legal effect or orally directing him to consult a lawyer.

Putting Transamerica's actions, arguendo, in the poorest light possible, and regarding them most favorably toward the Macdonald group, as a matter of law we cannot find where in these acts Transamerica breached any fiduciary duty created by the escrow arrangement or acted negligently toward the Macdonald group. There was, as we have earlier observed, no claim of fraud, deceit, misrepresentation or overreaching and none shown even by inference.

Mr. Stenesen's statements to Macdonald when he turned over to him the subordination agreement and the escrow instructions for ultimate signature did not misrepresent the effect of them in any way. He did no more than inform Macdonald that he needed them in order to close, that is, to consummate, the transaction for which the escrow had been established.

Significantly, Transamerica knew that Macdonald had sought and received the advice of his attorney, Mr. Best, with respect to the escrow papers and transactions earlier signed by the Macdonald group. Mr. Stenesen had no reason to believe that Macdonald would not, if he believed it to his benefit, consult Mr. Best again concerning the new escrow instructions and the subordination agreement. That Macdonald felt in no need of any such further consultation is reflected in his testimony that he knew that the agreement made the group's interests subordinate to a loan. Transamerica, of course, was not authorized to practice law nor under any duty to advise Macdonald to consult further with his own lawyer.

But aside from these considerations, Macdonald was in no position to repudiate his own signature, freely affixed with time and opportunity for consultation and reflection, upon a document well within his grasp and understanding. He had himself prepared his first escrow instructions—actually had typed them—which by their own terms expired and became void May 10. He was aware of the rider to the second deed of trust which expressly subordinated the

Macdonald group's interests to those of the lending bank; he—to Transamerica's knowledge—had sought out and been advised by his own lawyer. And he had sufficient time and opportunity to consult with his lawyer further with respect to the two documents given him on May 14 by Mr. Stenesen to take home for whatever study he desired.

If Transamerica had presumed to give Macdonald legal advice, it would have violated two basic professional precepts: The practice of law by an unauthorized and unlicensed person, and the intrusion of one professional consultant upon the affairs of another without the latter's knowledge and consent. The very document which placed the bank's superior position beyond cavil—though perhaps not required—in the legitimate discharge of its fiduciary duty, directly counseled the proposed signers to see their attorney. Plaintiffs here would impose upon Transamerica a duty toward its escrow principals to engage in the practice of law which that corporation had neither the legal right nor the requisite learning to do. *See In re Droker & Mulholland,* 59 Wn.2d 707, 370 P.2d 242 (1962); and *Andersen v. Northwest Bonded Escrows, Inc.,* 4 Wn. App. 754, 484 P.2d 488 (1971).

■ It is a general rule that a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents. *Perry v. Continental Ins. Co.,* 178 Wash. 24, 33 P.2d 661 (1934). One cannot, in the absence of fraud, deceit or coercion be heard to repudiate his own signature voluntarily and knowingly fixed to an instrument whose contents he was in law bound to understand. Plaintiff Macdonald, being not only a person of ordinary understanding but one with more than ordinary experience in land transactions and instruments of conveyance and security, and with time and opportunity both to consult with an attorney and to inspect the instruments before signing, cannot now be heard in law to repudiate his signature. The whole panoply of contract law rests on the principle that one is bound by the contract which he volun-

tarily and knowingly signs. As we said in *Lake Air, Inc. v. Duffy*, 42 Wn.2d 478, 480, 256 P.2d 301 (1953):

> Appellant had ample opportunity to examine the contract in as great a detail as he cared, and he failed to do so for his own personal reasons. Under these circumstances, he cannot be heard to deny that he executed the contract, and he is bound by it.

and we would adhere to the principle stated in *Johnston v. Spokane & I.E.R.R.*, 104 Wash. 562, 569, 177 P. 810 (1919), that

> It would be impossible for a person of ordinary intelligence, much less a person of the intelligence and ability of appellant, to have misunderstood the contents of this instrument upon a casual reading thereof . . .
>
> We have always held that a party whose rights rest upon a written instrument which is plain and unambiguous, and who has read or had the opportunity to read the instrument, cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein.

This aspect of this case is, therefore, reversed with directions to enter judgment for appellant Transamerica Title Insurance Company and against plaintiffs Macdonald, Stein, Lancaster and Christian and such other parties plaintiff as may have been a part of the Macdonald group.

National Bank of Washington

Vis-a-vis

Evelyn Stepnitz and Stepnitz Estate Guaranty

This particular cause involves a written guarantee of the loan which the court found unenforceable against the Minnesota estate of one of the guarantors—whose death occurred after his appearance in the case—and the decedent's widow, also a guarantor.

In May, 1969, when the National Bank of Washington and General Mortgage Investments entered into a construction loan agreement with Equity Investors to lend $1,750,000, the borrowers gave the lenders a promissory note in the sum of $1,850,000, secured by a first deed of trust on the real property. Performance of the loan agree-

ment and payment of the promissory note was guaranteed in writing by Richard L. Brama and Eileen D. Brama, M. Richard Walsh, Gloria L. Walsh and Brama Construction Company, a Minnesota corporation. The bank, as we have noted, made periodic disbursements on the loan through February 9, 1970, on requests by Brama Construction Company, the contractor, and Equity Investors, owner. From time to time the bank inspected and obtained written reports of the project to ascertain if the work had progressed so as to warrant the requested advances. In October, 1969, however, the bank's inspectors found that, although the project was about 63 percent complete, the requested advance would exhaust about 65.6 percent of the loan fund. Accordingly, the bank indicated it would require what the record describes as additional equity funds before making further advances. Walter Stepnitz at that point contributed $75,000. In October, General Mortgage Investments audited the project and calculated that construction costs would run to $1,988,475, instead of the earlier estimated $1,750,000. It agreed to advance an additional $100,000, and helped institute a procedure for waiver of liens in September or October, 1969, for all lien claimants receiving payment from the National Bank of Washington.

Then, on or about December 16, 1969, after the bank and General Mortgage Investments had disbursed a total of $1,386,659.21 in performance of the construction loan agreement, the defendants directly involved in this phase of the action executed the guaranty agreement upon which this particular action was brought. The guaranty agreement, by its terms, provided that the signatories, or new guarantors, as the instrument called them, jointly and severally guaranteed the collection of the note upon which the advances contemplated by the construction loan agreement would thereafter be made for completing the project. In pertinent part, the guaranty stated:

[T]he New Guarantors hereby jointly and severally and *unconditionally* guarantee to the Interim Lender [Bank] and Participant [General Mortgage Investments] that:

(a) The Note (in the full amount advanced up to $1,850,000 plus interest) will be fully paid by May 31, 1970 unless by that date it is purchased by the permanent lender for the floor amount, namely $1,480,000;

. . .

(c) By May 31, 1970 the following things will have happened (i) the Project will be completed in accordance with the plans and specifications therefor approved by the Permanent Lender and in accordance with the Construction Contract and (ii) all the conditions of the Permanent Lender for the purchase by it of the Note will be met; and

(d) The *New Guarantors will hold Interim Lender* and the Participant *harmless* from any and all loss due to advances made under the Note or on account of the Participant's purchase of an interest therein.

Each of the New Guarantors hereby expressly (i) waives presentment, demand, notice of non-payment, protest and notice of protest with respect to the Note and (ii) agrees that as to him or it this guaranty shall continue in full force and effect notwithstanding the death of any of the guarantors or the release of, or any extension of time granted with respect to, any of the guarantors or the Borrower or the security for the Note. So long as any portion of the Note is unpaid, none of the New Guarantors will collect from Borrower the claim, if any, by subrogation or otherwise, acquired through payment by any of the New Guarantors of any part of the Note. *The liability of each of the New Guarantors hereunder shall not be affected or impaired by any failure, neglect or omission to realize upon the Note or the security therefor.*

(Italics ours.)

Signing this guaranty agreement as new guarantors were Walter F. Stepnitz, Evelyn Stepnitz, M. Richard Walsh, Gloria Walsh and Brama Construction, Inc. When construction activities ended with the project still uncompleted, estimated costs of completion ran from $135,000 to $150,000 with only $107,000 remaining in the loan account still undisbursed. National Bank of Washington and General Mortgage Investments brought this action against Equity Investors and the guarantors of the loan to recover upon the

guaranty agreement and also to foreclose the deed of trust given by Equity Investors as security for the loan. Concluding that the bank and General Mortgage Investments had negligently administered the loan funds so as to impair what the record describes as the guarantors' security, the trial court exonerated the new guarantors from liability under the new guaranty agreement. On another issue, the court also held that it was without jurisdiction to enter judgment against the estate of Walter F. Stepnitz, one of the new guarantors, whose estate was in probate in Minnesota—an issue which we will subsequently consider.

The first question, then, is whether the bank so negligently administered the loan funds and disbursements as to release the new guarantors from liability on their written guaranty. In other words, did the bank and General Mortgage Investments breach any duty owed to the new guarantors upon which negligence could be found? If they did not, then there can be no demonstrable negligence upon which the new guarantors could be discharged.

Arguing the merits, defendant Stepnitz contended and the court ruled that affirmative detrimental action in handling loan proceeds operated to release the new guarantors from their guaranty. Cited as leading authority on this point is *Fidelity Sav. Bank v. Wormhoudt Lumber Co.*, 251 Iowa 1121, 104 N.W.2d 462 (1960), along with *Nolan v. Colorado Mortgage Co.*, 137 Colo. 103, 322 P.2d 98 (1958), and *Black Masonry & Contracting Co. v. National Sur. Co.*, 61 Wash. 471, 112 P. 517 (1911). In essence, the new guarantors contend that the lenders advanced to the builder and lien claimants more than that to which they were entitled under the construction loan agreement, that this tended to deprive the guarantors of part of their security and, as a matter of law, operated to release them from liability as guarantors. But we are unable to find in this record evidence of such dereliction or breach of duty. That other banks may have followed different procedures in advancing construction loan funds does not establish that this bank, in administering this loan, failed to act with reasonable pru-

dence. Whatever may be the general rules of guaranty and suretyship, we think in the absence of fraud, deceit and overreaching that the principles of law upon which the new guarantors rely have no application to the present contract. There are several reasons those principles do not apply here, not the least of which is that the parties to the new guaranty explicitly contracted against the contentions here made.

■ First, the guaranty agreement itself militates against defendant's contentions. It provides that, in consideration of releasing Richard L. Brama and Eileen Brama individually from the earlier guaranty, the new guarantors "hereby jointly and severally and unconditionally guarantee" that "The Note (in the full amount advanced up to $1,850,000 plus interest) will be fully paid by May 31, 1970," and that the "Project will be completed." Being unconditional by its terms, this guaranty amounts in law to an absolute guaranty and constitutes an unconditional promise to pay on default of the principal obligor. *Sherman, Clay & Co. v. Turner*, 164 Wash. 257, 2 P.2d 688 (1931); *Amick v. Baugh*, 66 Wn.2d 298, 402 P.2d 342 (1965). In the absence of fraud, if a guarantor unconditionally promises payment or performance of the principal contract, the guaranty is deemed absolute, unless by its terms a condition precedent to liability of the guarantor is created. *Sherman, Clay & Co. v. Turner, supra*. We stated the distinction between an absolute and conditional guaranty in *Robey v. Walton Lumber Co.*, 17 Wn.2d 242, 255, 135 P.2d 95, 145 A.L.R. 924 (1943), as follows:

> "The contract of guaranty may be absolute or it may be conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the debtor will pay the debt or perform the obligation. A conditional guaranty contemplates, as a condition to liability on the part of the guarantor, the happening of some contingent event *other than the default of the principal debtor* or the performance of some act on the part of the obligee. Where the guaranty is conditional, the obligation of the guarantor may not be enforced unless the event has oc-

curred or the act has been performed. . . . (Italics ours.)

"A guaranty of the payment of an obligation, without words of limitation or condition, is construed as an absolute or unconditional guaranty." 24 Am. Jur. 885, § 16.

The written guaranty contained no conditions either subsequent or precedent to its taking effect nor did it place any qualifications upon the imposition of liability. It contained no conditions operating to relieve the new guarantors of liability except that the borrowers pay the note according to its terms and conditions. Upon the default of Equity Investors as the principal debtor or obligor, the duty of the guarantor to pay became absolute.

An additional reason those principles do not apply here is that, although we do not find in this record evidence supporting the court's conclusion of negligence in administering the loan, we think that the contract of guaranty here anticipated the possibility that such a claim might be made, and the parties by contract laid to rest the possibility of such a defense. The guaranty agreement thus contained the following provision:

> The New Guarantors will *hold* Interim Lender and the Participant *harmless* from any and all loss due to advances made under the Note or on account of the Participant's purchase of an interest therein.
> . . . *The liability of each of the New Guarantors hereunder shall not be affected or impaired by any failure, neglect or omission to realize upon the Note or the security therefor.*

(Italics ours.) We do not assume the fact of negligence, but if there were negligence in administering the loan, a hold harmless clause such as the guaranty amounted to in these circumstances would not in public policy be void as a contract to immunize another against his own negligence. RCW 4.24.115. In the absence of fraud and deceit, the new guaranty, in our opinion, does constitute an enforceable contract which must be upheld. *Griffiths v. Henry Broderick, Inc.*, 27 Wn.2d 901, 182 P.2d 18 (1947); *Fleming v.*

*Stoddard Wendle Motor Co.,* 70 Wn.2d 465, 423 P.2d 926 (1967); *Tucci & Sons, Inc. v. Carl T. Madsen, Inc.,* 1 Wn. App. 1035, 467 P.2d 386 (1970).

A guaranty agreement of this kind is in essence a contract of indemnity, an undertaking to hold harmless made for a valuable consideration and as an inducement to the entering into and performance of another contract. It does not belong to that class of agreements alluded to by defendant here involving disclaimers of negligence or landlord liability where one in advance seeks to exonerate himself from the consequences of his negligence or misconduct. These agreements were held unenforceable as a matter of public policy in *Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971); and *McCutcheon v. United Homes Corp.,* 79 Wn.2d 443, 486 P.2d 1093 (1971).

An absolute and unconditional guaranty should be and is enforceable according to its terms. The courts are to enforce it as the parties meant it to be enforced, with full effect given to its contents, and without reading into it terms and conditions on which it is completely silent. *Poggi v. Tool Research & Eng'r Corp.,* 75 Wn.2d 356, 451 P.2d 296 (1969); *Dopps v. Alderman,* 12 Wn.2d 268, 121 P.2d 388 (1942); *Kanaskat Lumber & Shingle Co. v. Cascade Timber Co.,* 80 Wash. 561, 142 P. 15 (1914).

Here, the new guaranty agreement provided that:

> *The liability of each of the New Guarantors hereunder shall not be affected or impaired by any failure, neglect or omission to realize upon the Note or the security therefor.*

(Italics ours.) As a matter of law, the bank acted with reasonable dispatch to preserve its security. It neither neglected nor failed to sue upon the note or foreclose its interest in the property, and it did not otherwise impair the security supporting the debt. We do not believe, as the new guarantors now contend, that the bank's disbursement of substantially all the loan funds, rather than retaining 10 percent, impaired the security of the loan, for the loan funds were not the new guarantors' security but rather

were authorized to protect the bank. Additionally, the expenditure of the funds into the project would necessarily operate to enhance the security by adding to its value or reducing the claims against it. We find unacceptable the new guarantors' argument that the bank's retention of an additional sum of about $70,000, or about 3 percent of the project's total cost, constituted a condition, either precedent or subsequent, to guarantors' obligation to make good on their guaranty.

■ There was no claim here of fraud, misrepresentation, deceit or overreaching. At the time when the new guarantors bound themselves to the guaranty agreement, the project was well along. $1,386,659.21 of the loan funds contracted to be disbursed had already been advanced and projections already showed cost overruns. Whatever duty the plaintiff bank may have owed to the defendant new guarantors with reference to the method, manner and time of disbursing the remainder, we cannot find in this record that it breached that duty and, thus, we must conclude as a matter of law that the bank was without negligence toward the guarantor in making the postguaranty advances.

Outside the contract, the major duty which a construction lender owes to any other party is the duty of good faith; though a loan may be inefficiently managed and with adverse consequences, neither inferior lienors nor absolute guarantors have any recourse against the lender unless it is alleged and proved that the lender acted in bad faith. *Brooklyn Trust Co. v. Fairfield Gardens, Inc.*, 260 N.Y. 16, 182 N.E. 231 (1932). The decisions of the trial court releasing the new guarantors from the agreement are reversed.

Next, we must decide whether the court retained jurisdiction over the estate of Walter F. Stepnitz. Following his death, the estate was opened for probate in Minnesota and defendant Donald S. Julen was there appointed as administrator. Did the Superior Court for the State of Washington lose jurisdiction because of the death of new guarantor Walter Stepnitz? During his lifetime, Mr. Stepnitz had

been served in this particular action with a summons and complaint naming him as one of the defendant guarantors. He had entered an appearance and filed his answer to that complaint. Before the case came on for trial, however, he died in Minnesota. When the present cause came on for trial in King County, the trial court ultimately ruled that it was without jurisdiction over the estate or the administrator. Neither the estate nor the administrator entered an appearance in this case although they were afforded full opportunities to do so, and had been fully advised of this pending action.

When plaintiffs by motion sought to substitute the administrator in the Minnesota estate for Walter Stepnitz as party defendant in this action, they were proceeding, we think, within the letter and spirit of the civil rules governing survival of actions and substitution of parties. Relying mainly upon *In re Estate of Rowley*, 178 Wash. 460, 466, 35 P.2d 34 (1934), the defendants contended, and the court held applicable, the language of that opinion that "Foreign administrators and executors have no standing, as such, beyond the jurisdiction of the state in which they are appointed." We think, however, that the principle elsewhere stated in that same opinion declaring that an action shall not abate by reason of the death, mania, or other disability is the more pertinent statement of principles to the questions at hand. We there quoted Rem. Rev. Stat. § 193, as follows:

"No action shall abate by the death, marriage or other disability of the party, or by the transfer of any interest therein, if the cause of action survive or continue; but the court may at any time within one year thereafter, on motion, allow the action to be continued by or against his representatives or successors in interest."

In the instant case, the court had acquired in personam jurisdiction over Walter F. Stepnitz during his lifetime when plaintiffs had served the summons and complaint upon him personally, and he had filed an answer thereto. When Donald O. Julen, administrator of Walter F. Stepnitz'

estate, a resident of and acting as administrator in the state of Minnesota, made no appearance on behalf of the estate, plaintiffs moved to substitute the administrator as a party defendant under CR 25 (a) (1), which provides:

> If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by the successors or representatives of the deceased party or by any party and, together with the notice of hearing, shall be served on the parties as provided by Rule 5 for service of notices, and upon persons not parties in the manner provided by statute or by rule for the service of a summons. If substitution is not made within the time authorized by law, the action may be dismissed as to the deceased party.

A motion for substitution, and a notice of hearing thereon, was served upon the administrator, Julen. The court initially ordered the substitution to be made and ruled that Donald A. Julen, as administrator of Walter Stepnitz' Minnesota estate, be made a party defendant. Error is now assigned to the court's subsequent ruling that it acquired no jurisdiction over the out-of-state administrator and that the substitution should not be held good.

■ We are of the opinion that, under the rules of civil procedure in general and CR 25 (a) (1) in particular, the motion for substitution was well taken and that the court did acquire jurisdiction upon entry of the order of substitution. The record does not show either want of notice, or time or opportunity to appear, prepare and defend—and these points were not raised in opposition to the substitution. The court was not requested to enlarge the time for further answer or for preparing a defense and there is, thus, no question of procedural due process insofar as it involves these questions of notice, time and opportunity to prepare and defend.

On the narrow question of jurisdiction, the rules of this court in general and CR 25 (a) (1) in particular were, we think, intended to cover the situation now before us and to

expedite the trial of cases on their merits where no basic rights to procedural due process will be lost to any party.

Mr. Stepnitz, as noted, had appeared in the pending action by filing his answer. The superior court thereby acquired jurisdiction over him and the subject matter of the action as it concerned him. He was prepared to defend the action in this forum, whose process had been directed to him. His intervening death did not operate to cut off the jurisdiction obtained during his lifetime, and the action pending against him did not abate with his death. The general administrator of his estate, in being substituted, simply stood in the deceased party's place as a personal representative, in the very role that CR 25(a)(1) was meant to establish. Aside from perhaps the problem of providing security for costs, had Walter F. Stepnitz been the plaintiff rather than a defendant, his out-of-state administrator, we think, could have prosecuted the action on motion for substitution in the same way that we rule now he should defend it.

Reversed and remanded for a determination of damages.

## Confirmation of Sale Issue

### No. 42354

In this phase of the consolidated appeals, the National Bank of Washington appeals an order of the trial court fixing an upset price of $2,247,500 for foreclosure sale.

Following trial, a judgment and decree of foreclosure was entered October 22, 1971, in favor of National Bank of Washington and General Mortgage Investments and against Equity Investors, M. Richard and Gloria Walsh, husband and wife, and Brama Construction Company, jointly and severally, in the principal amount of $1,742,678.63, plus accrued interest at 9 percent in the sum of $63,918.20 and an additional interest to entry of judgment in the amount of $242,038.66 plus attorney fees at $40,473.53 and costs. Plaintiff bank and General Mortgage Investments were decreed to have deed of trust liens which were ordered foreclosed, and the real estate was ordered to be sold at foreclosure sale. Accordingly, the clerk of court issued a notice of sale,

and a sheriff's sale was held February 18, 1972, at which the plaintiff bank bid $1,883,712.33, and later filed a motion for an order confirming sale.

At a continued hearing on the motion to confirm sale, March 23, 1972, the trial court held RCW 61.12.060 to be applicable and appropriate, and the court fixed an upset price at the total amount of the judgment, $2,247,500. The bank and its associated finance institution now assign error to the fixing of any upset price and to the amount actually prescribed.

The statute, which the court applied, reads:

> In rendering judgment of foreclosure, the court shall order the mortgaged premises, or so much thereof as may be necessary, to be sold to satisfy the mortgage and costs of the action. The payment of the mortgage debt, with interest and costs, at any time before sale, shall satisfy the judgment. The court, in ordering the sale, may in its discretion, take judicial notice of economic conditions, and after a proper hearing, fix a minimum or upset price to which the mortgaged premises must be bid or sold before confirmation of the sale.
>
> The court may, upon application for the confirmation of a sale, if it has not theretofore fixed an upset price, conduct a hearing, establish the *value* of the property, and, as a condition to confirmation, require that the *fair value* of the property be credited upon the foreclosure judgment. If an upset price has been established, the plaintiff may be required to credit this amount upon the judgment as a condition to confirmation. If the *fair value* as found by the court, when applied to the mortgage debt, discharges it, no deficiency judgment shall be granted.

(Italics ours.)

■ The court, we think, acted within its discretionary powers under RCW 61.12.060 in setting an upset price to be paid at the foreclosure sale. The factors to be considered in determining whether and in what amount an upset price should be prescribed are found in *Lee v. Barnes*, 61 Wn.2d 581, 379 P.2d 362 (1963). There, tracing the history of the statute, we said, "[T]he purpose of fixing an upset price is

to assure the mortgagor of *a fair price,* as would be attained were there willing and competitive bidders available at the time of sale." (Italics ours.)

The bank and General Mortgage Investments, tracing the statute's origin in the depression years and its construction in contemporary and later cases say it should be limited in its application to occasions of major economic depression and dislocation, but that contention, we think, was impliedly rejected in the *Lee* case even though the upset price statute (RCW 61.12.060) was adopted while the country was in the throes of a major economic depression. In the *Lee* case, we quoted at length from *Suring State Bank v. Giese,* 210 Wis. 489, 246 N.W. 556, 85 A.L.R. 1477 (1933), from which the Washington statute was derived. That opinion, we think, established a basis for the statute not only during the then-current economic depression generally but was founded more particularly on the premise that the want of competitive bidding fails to produce a sale price equivalent to the value in terms of usefulness of the property. It is of little moment in a particular case whether it is temporary economic fluctuations, peculiarly local conditions in the real-estate market, or a national economic depression which will militate against reasonably competitive bidding. If, because of the kind, nature, scope or peculiarities of the property, or a depressed economy, local or general, genuinely competitive bidding will be substantially discouraged or even stifled, the court in its discretion may, under the statute, prescribe an upset price. Thus, we think that the statute is properly invoked in any case where all of the circumstances leading to and surrounding a distress or foreclosure sale warrant the superior court in the exercise of a sound discretion in finding that there will be no true competitive bidding. When in the sound exercise of that discretion the court finds it should fix an upset price, we will not disturb that finding.

Next, we consider whether the price set by the judge, $2,247,500, under the conditions and circumstances prevailing, constituted an abuse of the court's discretion.

The statute says that the court, "in ordering the sale, may in its discretion, take judicial notice of economic conditions, and after a proper hearing, fix a minimum or upset price to which the mortgaged premises must be bid or sold before confirmation of the sale." We think that the statute means that the upset price should reflect "the fair value of the property," for the term "fair value" appears twice and the term "value" once in the statute. The court thus, upon application for the confirmation of a sale, if it has not theretofore fixed an upset price, may conduct a hearing, establish the value of the property, and, as a condition to the confirmation, require that the fair value of the property be credited upon the foreclosure judgment.

Accordingly, where, in the court's sound discretion at a foreclosure or other judicially ordered distress sale, an upset price should be fixed, the next step is to fix the amount. The statute calls not for what the court would determine to be the *minimum value,* but rather its *fair value.* As we said in *Lee v. Barnes, supra,* the court "should assume the position of a competitive bidder determining a fair bid at the time of sale under normal conditions." This means that, in deciding upon fair value at a foreclosure sale, the court may consider the state of the economy and local economic conditions, the usefulness of the property under normal conditions, its potential or future value, the type of property involved, its unique qualities, if any, and any other characteristics and conditions affecting its marketability along with any other factors which such a bidder might consider in determining a fair bid for the mortgaged property. The court may properly receive any competent evidence, whether opinion or of direct facts which might affect the amount of such a bid.

Here the record contains evidence of the actual investment in the property of approximately $2,300,000. In determining the advisability of the loan, the bank relied upon an appraisal institute appraisal of $2,500,000. Appraisal testimony was received and two expert witnesses set the value at $2,000,000 and $2,150,000. In view of the range of figures,

and the position of the trial court to evaluate the witnesses and to determine from the evidence what might be a fair price for the property, we are unable to say that the court here abused its discretion.

 The fixing of an upset price at a judicial sale is a matter within the trial court's discretionary powers. As in other areas, the trial court possesses considerable latitude in determining any matter of a discretionary nature. In the recent case of *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971), this court said:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. [Citation omitted.] Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

Finding no such abuse of discretion here, we affirm the judgment and order of the trial court, and find that the court properly ordered the setting of an upset price and, after doing so, did not abuse its discretion in the price that it set or the manner in which it did so.

Affirmed.

## Conclusion

In conclusion, then, and to summarize: We find that advances by the bank under its construction loan agreement with Equity Investors were optional in law rather than obligatory, and hold that Columbia Wood Products' materialman's lien is superior to the bank's lien for later advances and, accordingly, reverse.

As a matter of law and on the particular facts presented in the case between the Macdonald group and Transamerica Title Insurance Company, we hold that Transamerica as a matter of law was not negligent nor did it violate its fiduciary duty toward the Macdonald group, and the trial

court is, therefore, reversed with directions to enter judgment for Transamerica and against the Macdonald group.

In the case between the National Bank of Washington and the new guarantors, we hold that the bank, as a matter of law, did not breach any duty owed to the guarantors; the sole duty owed by the bank to the new guarantors under the agreement and existing law was to manage the loan in good faith. The guaranty agreement, accordingly, is valid and the trial court is, therefore, reversed.

We hold that notice of service upon the Minnesota administrator of the estate of a deceased party who had been personally served and who entered and defended the action was sufficient to meet constitutional and statutory demands of due process of law, and that the estate was, therefore, properly a party. The trial court is reversed and we remand for a determination of damages.

Finally, we hold that the trial court was justified, because of an apparent lack of real competitive bidding, to set an upset price for the property at the sheriff's sale, and that the price so set was within the proper limits of discretion of the trial court. On this issue, the trial court is affirmed.

So ordered.

FINLEY, HUNTER, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., and RYAN, J. Pro Tem., concur.

Petition for rehearing denied June 14, 1973.