[No. 28870.   Department One.   February 25, 1943.]

SOPHIA CEDAR, *Respondent and Cross-appellant,* v.
W. E. ROCHE FRUIT COMPANY, *Appellant.*[1]

[1]Reported in 134 P. (2d) 437.

*J. P. Tonkoff*, for appellant.

*Harry L. Olson*, for respondent and cross-appellant.

JEFFERS, J.—This is an appeal by defendant, W. E. Roche Fruit Company, a corporation, from a judgment made and entered June 19, 1942, in favor of plaintiff, Sophia Cedar, for the sum of $110.59, together with interest and costs, and dismissing defendant's cross-complaint. Plaintiff has cross-appealed.

While the amount of the judgment is small, the questions presented are important to those operating orchards, and especially to those financing such operators.

The facts in the case are not greatly in dispute. Sophia Cedar had for some years owned a ten-acre

fruit orchard in the Yakima valley. She had not lived in the valley for some years, and had leased her property to different tenants. On November 6, 1939, she leased the property to Ben F. Stone for the term beginning December 1, 1939, and ending December 1, 1940. This lease was not recorded. It contained, among other provisions, the following:

"1. That they [lessees] will occupy, till and in all respects cultivate the above described premises during the term of this lease in a good and farmerlike manner, and will thoroughly prune, spray, cultivate, irrigate and care for the orchard upon said premises at the proper time and in accordance with the best practice of said district, and will properly pick and handle said crop at the proper time, all at lessees' own expense and without costs of any kind to the lessor herein.

"2. The lessees will pay as rent for said premises one-fourth of the gross proceeds from the sale of all fruit and other produce grown upon said premises, said proceeds to be paid to the lessor immediately upon being received by the lessees.

"4. The lessees shall have the exclusive sale of crops grown upon said premises, but said crops shall be sold as soon after harvesting as a reasonable price can be obtained, and said crops shall be sold by the lessees at the highest available market price."

Stone and wife went into possession of the premises under this lease, and operated the property. It will be noticed that the lease gave Stone the exclusive sale of the crops. On or about July 15, 1940, Mr. Stone went to defendant's place of business, where, according to the testimony of W. E. Roche, president of defendant company, Stone stated that he had bought this property, and wanted to make arrangements to finance the growing, harvesting, packing, and selling of the crop then growing on the place. Mr. Roche caused the records of Yakima county to be examined, and found no record of any encumbrance against

this crop, except a chattel mortgage given by Stone to Stubbs Fruit Company. Mr. Stone did not inform Mr. Roche of the lease.

After Mr. Roche had talked to Stone, and after an examination of the records, defendant and Mr. Stone, on July 15, 1940, entered into a written "Fruit Purchase Contract and Mortgage," in which Stone was named as "Grower" and defendant as "Fruit Company." This contract and mortgage, admitted in evidence as defendant's exhibit 9, was filed for record July 18, 1940. The sum of $525 was immediately made available to Mr. Stone, of which $464.54 was used to satisfy the Stubbs Fruit Company mortgage.

From an examination of the record herein, and especially plaintiff's exhibit 5, which purports to be a statement of the Stone account with defendant, showing all of the Stone fruit handled by defendant, the price for which it was sold, and defendant's charges against the same, it appears that, up to and including August 3, 1940, defendant had advanced to Stone $679.30. This included the original $525 and $154.30 additional.

On August 3, 1940, as appears from a letter of that date (plaintiff's exhibit 8), written by Mr. Harry Olson, attorney for plaintiff, to Mrs. Cedar, Mr. Olson interviewed Mr. Stone and during the conversation Mr. Stone informed him of defendant's mortgage. At that time, Mr. Olson had Mr. Stone execute to Mrs. Cedar a chattel mortgage on the fruit here in question. This chattel mortgage, properly executed and filed on August 3, 1940, purported to cover all crops growing and being raised on the property occupied by Stone. The mortgage further provided:

"The mortgagor agrees that all further fruit will be sold jointly in the names of mortgagor and mortgagee, Ben F. Stone and Sophia Cedar.

"This mortgage is given to secure mortgagee's share of the cherry money and also as security for mortgagee's share of proceeds of all future crops, pursuant to that certain farm lease between the parties hereto, acknowledged on the 6th day of November, 1939.

"As security for the payment to Sophia Cedar, mortgagee, of the sum of One Hundred Sixty-six and 76/100 Dollars, and one-fourth of balance of gross proceeds from crops."

Mr. Stone had, by the fruit purchase contract and mortgage of July 15th, appointed defendant his marketing and selling agent.

It does not appear that Mrs. Cedar actually knew of defendant's mortgage until she received Mr. Olson's letter of August 3rd. Nor does it appear that defendant had actual notice of Mrs. Cedar's mortgage until August 17th. Between August 3 and 17, 1940, defendant advanced to Mr. Stone $307 additional, making the total advanced, to and including that date, $986.30.

Sometime between August 17 and 29, 1940, plaintiff went to Yakima and talked with Mr. Roche, who testified that Mrs. Cedar told him she was in need of money and that she had received nothing from the farm, as Mr. Stone had not sent her one-fourth share of the proceeds from the cherries harvested from the property, which she stated was $166.76; that Mrs. Cedar asked him to advance her that sum, and also to make some advance on the pear crop. Mr. Roche further testified that at that time he believed that the proceeds from the crop would be sufficient to take care of the advancements already made to Stone, the further advances and charges of defendant, as well as the amount requested by Mrs. Cedar, and that defendant accordingly, on August 29, 1940, advanced to Mrs. Cedar the sum of $267.01, by delivering to Mr. Olson a check for that amount. Defendant did not handle the cherry

crop for Stone, and Mr. Roche stated that he took Mrs. Cedar's word for the amount due her, and that the advance to her was made up of $166.76 and an additional sum of $100.25, being one-fourth of the proceeds from Bartlett pears. Mrs. Cedar admitted that she had made the statements testified to by Mr. Roche.

It appears without contradiction, from the testimony of defendant's field man, who was watching this orchard, that, beginning in September, 1940, Mr. Stone began to use intoxicating liquor to excess, and, as a result of this, began to neglect the orchard, and finally, before the crop was all picked, Stone abandoned the property, and it became necessary for defendant to guarantee the wages of pickers and haulers in order to get the crop to defendant's warehouse. Mrs. Cedar admitted that she knew Stone was drinking, and knew that he left the property and that it was necessary for Roche to pay the pickers, haulers, etc.

It does not appear that, in her conversation with Mr. Roche, Mrs. Cedar made any contention that her mortgage was a lien prior to defendant's mortgage, nor did she question the right of defendant to make advances. However, under date of August 17, 1940, Mr. Olson wrote to defendant:

"I understand that you have been purchasing fruit from the ranch owned by Sophia Cedar and leased to Mr. Ben F. Stone.·

"Mr. Stone has advised you, I believe, that Mrs. Cedar is entitled to one-fourth of the crop from this ranch, and that she also has a crop mortgage on all of the crop to secure her one-fourth interest, and in addition, $166.76 due her from the cherry crop.

"Would you kindly advise me how soon we can expect payment for Mrs. Cedar's share, and I would also appreciate receiving a statement covering the fruit purchased by you."

To the above letter, defendant, on August 19th, replied:

"We hold a first mortgage on Ben F. Stone's fruit. There is also a second mortgage by Mrs. Cedar.

"When you will receive payment is something I am unable to tell as the money we have advanced to carry on work on this ranch will have to come out first."

Mr. Olson wrote another letter to defendant on October 21, 1940, in which he again made the claim that Mrs. Cedar was entitled to one-fourth of the gross proceeds of the crop. Defendant, on October 22nd, answered this letter, stating that it was of the opinion that after its mortgage was satisfied defendant would "be considerably in the hole," as the fruit delivered from the Stone ranch "was junk." On October 23rd, Mr. Olson again wrote defendant, making the same contention as in his former letters.

On June 20, 1941, Mr. Olson wrote defendant acknowledging receipt of a statement relative to the Stone fruit, from which it appeared that defendant had received a total of $2,638.42 from the Stone fruit. Mr. Olson further stated in this letter:

"And you heretofore accounted to us for Mrs. Cedar's percentage of the proceeds of the pears [$400.99], leaving $2,237.43 of the proceeds for which an accounting is now due Mrs. Cedar.

"It would therefore seem that since, in addition to the pear money, the gross proceeds amounted to $2,237.43, Mrs. Cedar is entitled to one-fourth thereof, or $559.35, for which amount it is requested that you forward your remittance."

Again on July 2, 1941, Mr. Olson wrote defendant, asking for a remittance of the amount of $559.35. In answer to this letter, defendant directed Mr. Olson to take the matter up with Mr. Tonkoff, defendant's attorney.

As shown by plaintiff's exhibit 5, hereinbefore referred to, which we assume is the same statement as that referred to in Mr. Olson's letter of June 20, 1941,

and defendant's exhibit 11, which is a recapitulation of exhibit 5, defendant received for all fruit sold the sum of $2,638.42. It further appears from exhibit 11 that defendant's charges for packing, storage, and selling this fruit was $1,510.42, and other charges and advances, including the check for $267.01 to Mrs. Cedar, amounted to $1,744.19, making a total of $3,254.61, thus showing that defendant had advanced and expended some $616.19 more than it had received for the fruit. It is not contended that any of these charges were unreasonable or unnecessary.

In her complaint, plaintiff alleged that the reasonable market value and gross proceeds received from the fruit was $2,237.43 (which does not include the sum of $400.99 received for Bartlett pears); that plaintiff is entitled, by virtue of her lease and chattel mortgage, to receive one-fourth of the gross proceeds, or $559.35, together with interest at six per cent from June 20, 1941, the date demand was made upon defendant.

Defendant, in its answer, in addition to denying plaintiff's claim, by way of an affirmative defense referred to its purchase contract and mortgage and by such reference made that instrument a part of its answer, and further alleged that, ever since the execution of such contract and mortgage, Ben F. Stone had been at all times indebted to defendant in excess of $525, and is now indebted to defendant in the sum of $616.19, as a result of defendant's advancing money to Stone in the growing, harvesting, and disposing of the fruit crop.

By way of a cross-complaint, defendant alleged that, on August 29, 1940, at the special instance and request of plaintiff, defendant advanced and loaned to plaintiff the sum of $267.01; that plaintiff promised and agreed to repay that sum of money on or before the first of April, but that she has not done so.

The court, on June 19, 1942, made and entered findings of fact, conclusions of law, and judgment in favor of plaintiff for $110.59. The judgment also dismissed defendant's cross-complaint.

Alternative motions for judgment notwithstanding the judgment and for new trial were made by defendant and denied. Defendant has appealed from the judgment entered, claiming the court erred in awarding judgment to plaintiff and in dismissing its cross-complaint. Plaintiff has cross-appealed, contending that the court erred in deducting from the gross proceeds defendant's cost of packing, storage, and selling, and in deducting from plaintiff's share of the proceeds of the balance of the crop the payment of $166.76 advanced to her.

The theory of the trial court and the method by which the court arrived at the amount of the judgment awarded respondent is shown by the conclusions of law, which state:

"1. That under said lease agreement dated November 6, 1939, the lessee, Ben F. Stone, was not obligated to incur the expense of *picking* [we think this is an error and was meant to be *packing*, for in its memorandum opinion the court specifically said, 'and those expenses which I think it proper to deduct are the costs of packing, storage, and selling'], storage and selling of the fruit grown on said property.

"2. That the defendant may deduct the sum of $1128.00, this being its cost of picking [packing], storage and selling, from the sum of $2,638.42, this being the gross return received by the defendant from said fruit crops, the total amount of the gross proceeds determined by said deduction being the sum of $1510.42. That plaintiff is entitled to one-fourth of the gross proceeds, or $377.60, from which figure defendant is entitled to deduct the amount of $267.01, the amount it has heretofore paid to plaintiff, this leaving a balance of $110.59."

We have been unable to follow the court or counsel in some of the figures used in arriving at the amount of the judgment. The court allowed appellant to deduct the sum of $1,128, which the court states was the cost of packing, storage, and selling. The only place we can find reference to $1,128 is on appellant's exhibit 11, which is a recapitulation of respondent's exhibit 5, to which reference has heretofore been made, and, as shown by exhibit 11, the $1,128 is not the cost of packing, storage, and selling, but is the net amount credited to the grower after deducting $1,510.42, the cost of packing, storage, and selling, from the amount received for the fruit, as shown on that exhibit.

We are concerned here primarily with the question of priorities of mortgages, the particular question being whether or not appellant's contract and chattel mortgage, which was properly executed and thereafter filed on July 18, 1940, and which provided, among other things, that the mortgage was given to secure the sum of $525, as well as advances made from time to time to the grower, all indebtedness which may accrue for supplies or merchandise sold, all charges incurred in selling and handling the crop and to secure the performance of the contract, and other provisions to which reference will be made, is a first lien and prior to the lien of the chattel mortgage of respondent, properly executed and filed on August 3, 1940, on all the fruit raised on the Stone ranch, to secure the sum of $525 originally advanced by appellant, also subsequent advances made and supplies furnished to the grower up to and including the time the fruit was delivered to appellant, and also for the reasonable cost of packing, storing, and selling the fruit.

If appellant's mortgage had been the usual chattel mortgage, appellant clearly would be entitled to priority under our recording statutes. *Cashmere*

*Valley Bank v. Pacific Fruit & Produce Co.,* 198 Wash. 363, 88 P. (2d) 579. Appellant cites the foregoing case as supporting its contention that, its mortgage having been filed prior to the mortgage of respondent, appellant is entitled to deduct from the gross proceeds all charges, advancements, supplies, and merchandise made and furnished to the grower under the contract and mortgage. As we have said, if appellant's contract and mortgage had been the usual chattel mortgage, there can be no question but that the cited case, as well as the cases of *Wenatchee Production Credit Ass'n v. Pacific Fruit & Produce Co.,* 199 Wash. 651, 92 P. (2d) 883, and *Loudon v. Cooper,* 3 Wn. (2d) 229, 100 P. (2d) 42, would support the contention that its mortgage, having been first filed, would be a lien for the amount secured by the first mortgage, superior to that of a mortgage subsequently filed. The foregoing cases do not involve the question of the right of the first mortgagee to make advances and furnish services and supplies after actual notice of the junior mortgage.

In the instant case, at the time of filing appellant's mortgage, appellant had advanced only $525. However, it is apparent from even a casual reading of appellant's contract and mortgage that it was contemplated by the parties that future advances would be made as the season progressed; that appellant would furnish the supplies and services necessary to put the fruit in a condition so that it could be sold; and that appellant would sell the fruit. This required, among other things, that the fruit be warehoused, washed, sorted, and packed, these latter operations to be in appellant's warehouse, as it does not appear that there were any facilities on the farm for such operations. Appellant's mortgage was clearly one to secure future advances.

We have recognized the validity of such mort-

gages in *Eltopia Finance Co. v. Colley,* 126 Wash. 554, 219 Pac. 24, and *Elmendorf-Anthony Co. v. Dunn,* 10 Wn. (2d) 29, 116 P. (2d) 253.

We have also adopted what seems to be the majority rule regarding priorities of this type of mortgage. In the *Elmendorf-Anthony Co.* case, *supra,* we quoted from an annotation in 5 A. L. R. 398:

" 'By the weight of authority, a mortgage for future advances becomes an effective lien from the time of its execution, or, as to subsequent purchasers and encumbrances, from the time of its recordation, rather than from the time when each advance is made, where the making of the advances is obligatory upon and not merely optional with the mortgagee.' "

In the instant case, actual notice of respondent's mortgage was received by appellant on August 17, 1940. Subsequent to that time, appellant made advances, furnished supplies, and incurred all the costs of packing, storage, and selling. It is to these advances and charges made after notice that respondent claims priority, and especially to the packing, storage, and selling charges, which the trial court held appellant was entitled to deduct from the gross proceeds of the fruit. Respondent, to sustain her contention in this regard, cites the *Elmendorf-Anthony Co.* case, *supra.* If the rule announced in the cited case is applicable herein, then appellant would be entitled to deduct from the gross proceeds only $986.30, the amount advanced by it up to the time it had notice of the junior mortgage, providing it was not limited by the mortgage and contract in the amount of advances to be made.

The rule relative to optional and obligatory advances seems, so far as we are advised, to have been generally applied to building contracts, and whether or not such advances are optional or obligatory is usually determined by ascertaining whether or not

the mortgagee is contractually bound to make future advances. *Boise Payette Lbr. Co. v. Winward,* 47 Idaho 485, 276 Pac. 971; *E. K. Wood Lbr. Co. v. Mulholland,* 118 Cal. App. 475, 5 P. (2d) 669; *Hance Hardware Co. v. Denbigh Hall Inc.,* 17 Del. Ch. 234, 152 Atl. 130.

However, it has been recognized that a mortgagee may be obliged to continue advances for his own security.

"Advances made by a mortgagee after he has actual notice that others have acquired rights in the property will be postponed to the rights acquired by such other persons, unless the mortgagee be under a binding contract to make the advances, *or it be essential to his own security to complete the advances contemplated by the mortgage.*" (Italics ours.) 1 Jones on Chattel Mortgages and Conditional Sales (Bowers ed.) 173, § 97.

We are satisfied that, in the type of case now before us, and under a contract and mortgage such as appellant here has, such a mortgage would be a lien superior to that of a mortgage subsequently filed, for all advances, supplies, and charges reasonably made to carry out those operations which were necessary to preserve the security and make it a marketable article. This security—fruit—is a perishable crop. It really has very little value until it is ready for market. To bring the fruit along to this point, in the apple districts of this state, it is necessary that the trees be pruned, sprayed, and irrigated, the apples picked and hauled to a warehouse, where they are washed, sorted, graded, and packed. If one who has in good faith advanced money and furnished supplies to a grower for some of the first necessary operations, as did appellant in this case, be denied a lien for subsequent advancements and charges made to continue the operations, after notice of a subsequent mortgage, such prior mortgagee would, in most cases, lose entirely his security for the amount advanced, for the reason, as

stated, that apples left on the trees during the growing period, without irrigation, spraying, etc., would be practically of no value.

This being the situation, we are of the opinion that it is recognized, and was recognized in this case, that appellant would make advances and do the things covered by its contract and mortgage necessary to be done to put the apples in a salable condition, and sell them, and that it was not contemplated that appellant would be reimbursed, or that it would have any security from which it could be reimbursed, prior to the time of sale. We are also of the opinion that respondent knew, or should have known, from an inspection of appellant's contract and mortgage, that such was the situation.

It is not contended that any of the advances or charges made, or supplies furnished, by appellant were for purposes other than those contemplated by the contract and mortgage, or that any of them were unreasonable. In other words, our conclusions as above expressed are based upon the theory that such future advances, services, and charges were necessary to protect the advances made and supplies furnished up to the time appellant had notice of the second mortgage.

We appreciate that to some extent the same argument was advanced and denied in the *Cashmere Valley Bank* case, *supra;* however, we believe that the fact that in the instant case appellant's mortgage was filed prior to that of respondent is sufficient to distinguish that case.

While we do not attempt to say that under the mortgage appellant could have been forced by Stone to continue to make expenditures, still we believe that the advances and charges made by appellant after notice of respondent's mortgage can be said to have been obligatory in the sense that they were necessary to

protect the previous loans and advances made by appellant. See *Hyman v. Hauff*, 138 N. Y. 48, 33 N. E. 735.

The general rule that optional advances after actual notice of an intervening mortgage will not be accorded priority, is based upon the theory that the first mortgagee should not be permitted to additionally encumber the mortgaged property voluntarily, to the detriment of subsequent encumbrancers. *Chartz v. Cardelli*, 52 Nev. 1, 279 Pac. 761. This argument is not persuasive in this case, because, unless the additional advances had been made, supplies furnished, and services rendered, there would have been but few, if any, apples to sell. These expenditures had to be made before either appellant or respondent would realize on their security.

We are also of the opinion that the equities in this case are all in appellant's favor. Through respondent's failure to record her lease, reserving to her a share in the gross proceeds of the fruit, appellant was misled when it searched the record to determine if there were any outstanding encumbrances. Relying upon the statements made by Mr. Stone and the record as it appeared, appellant entered into the contract. Even under her lease, respondent was not entitled to receive any rental from Stone until the fruit was sold.

It is true in this case that, because of the failure of Stone to properly look after the crop, it was wormy and did not sell for sufficient to pay the loans, charges, and advances made by appellant, and to pay respondent; but that was no fault of appellant.

Respondent further contends that appellant's mortgage provides that it was given as security for $525 then advanced, and future optional advances of an additional six hundred dollars, or a total of $1,125, and therefore appellant in no event would have a prior

lien for more than $1,125. It will be remembered that the instrument relied upon by appellant is a combination fruit purchase contract and chattel mortgage. The purchase contract provides primarily for the marketing and selling of the fruit, and appellant is appointed the grower's agent for that purpose. It also provides that the grower will deliver the fruit to appellant's warehouse in Yakima for grading and packing, in accordance with the regular standard of grading and packing in effect in the district. It further provides that any charges for picking, warehousing, loading, and storing done or supplies furnished shall be charges against the grower's fruit and may be deducted by appellant from money in its hands.

In this part of the contract there is an estimate of two thousand boxes Double Red Delicious, two thousand boxes Jonathans, twenty-five hundred boxes Winesaps, twenty tons Bartletts, three hundred boxes Nellis. While that is the estimate made of the fruit at the time of the contract, because of the condition of the fruit when received it did not pack out the number of boxes estimated. We set out the above estimate for the purpose of showing that the six hundred dollar limitation hereinafter referred to could not have been meant to apply to all charges, services, supplies, and advances to be made by appellant, as the amount appellant was to receive for marketing charges alone would be more than six hundred dollars.

We now come to the mortgage part of the instrument in question, and here we find an apparent limitation to six hundred dollars on the advances. We have carefully examined the contract and mortgage, with the question in mind of whether or not, regardless of whether the future advances be said to be optional or mandatory, appellant in any event is limited, in so far as its lien is concerned, to six hundred dollars for ad-

vances made and supplies furnished, including the cost of packing, warehousing, and selling. We have come to the conclusion that the parties could not have intended the six hundred dollars to cover all advances, charges, supplies, and services to be furnished, and we are especially convinced they did not intend such amount to cover the costs of packing, warehousing, storage, and selling. Rather, we are of the opinion that it is evident from the contract and mortgage, and was intended by the parties, that the limitation of six hundred dollars was to apply to actual money and supplies advanced to the grower up to the time the fruit was delivered to the warehouse. To this extent we think appellant is bound by the six hundred dollar limitation.

This being true, we agree with the trial court that appellant is entitled to deduct from the gross proceeds the cost of packing, storage, and selling, which we have found to be $1,510.42. Appellant is also entitled to deduct the sum of $525, the original loan, and the additional sum of six hundred dollars, advances made to Stone prior to the time the fruit was delivered to the warehouse, not on the theory that such advances were optional, but on the theory that advances for the purpose mentioned were, in the mortgage, limited to that amount, making a total of $2,635.42. Under the mortgage, appellant is entitled to interest at the rate of eight per cent per annum on all advances made. When interest on the original $525 alone, from July 15, 1940, to June 19, 1942, the date of the judgment, is added to the sum of $2,635.42, it is evident there would be no proceeds from the sale of the fruit left. Appellant is also entitled to judgment on its cross-complaint for $267.01, advanced to respondent.

The judgment is reversed on appellant's appeal, with direction to dismiss respondent's complaint and enter

judgment for appellant on its cross-complaint in the sum of $267.01.

ROBINSON, MILLARD, STEINERT, and MALLERY, JJ., concur.

[1]Reported in 134 P. (2d) 454.