In re Kevin M. STANTON; In re Maryann G. Stanton, Debtors.

Gregory Beeler, Appellant–Cross–Appellee,

v.

Harrison Jewell, fka International Factors, Inc., Appellee–Cross–Appellant.

Nos. 00–35474, 00–35518.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 17, 2001.

Filed April 9, 2002.

Amended Sept. 13, 2002.

Gregory Beeler, Tri–Cities, WA, pro per.

Sigurd Borgersen, Schwabe, Willamson, Ferguson & Burdell, Seattle, WA, for the appellee.

Before FARRIS, KLEINFELD, and GOULD, Circuit Judges.

Opinion by Judge KLEINFELD; Dissent by Judge GOULD.

## OPINION

KLEINFELD, Circuit Judge:

This is a bankruptcy case turning on lien priorities.

### Facts

International Factors, Inc., in whose shoes Harrison Jewell now stands, financed Fleet Manufacturing. Fleet was a corporation. Kevin and Maryann Stanton, husband and wife, owned all the shares. International Factors took a security interest in Fleet's property in 1994, with several continuing financing arrangements. That same year, the Stantons personally guaranteed Fleet's obligations to International Factors.

Fleet got a big order from K–Mart, and needed more financing than in the past to make what K–Mart had ordered. As a condition of increasing its advances to Fleet Manufacturing, International Factors obtained a second mortgage on the Stantons' house. Later that year, the Stantons (but not Fleet) went bankrupt and filed a September 30, 1994 petition for Chapter 11 bankruptcy. International Factors continued to advance funds to Fleet on the pre-existing lien on the Stantons' house.

On May 11, 1996, the bankruptcy proceeding was converted to Chapter 7. The bankruptcy trustee sold the Stantons' house, and International Factors sought to attach the proceeds of the sale, based on the lien created by its deed of trust. On September 26, 1996, the trustee filed this action, seeking to avoid International Fac-

tors' lien. Both sides filed motions for summary judgment.

The bankruptcy court granted the trustee's motion, on the theory that the Stantons had encumbered estate assets without court authority when Fleet took on more debt after the Stantons filed for bankruptcy.[1]

The Bankruptcy Appellate Panel reversed, with one judge dissenting.[2] The BAP held that the Stantons encumbered their house before the bankruptcy, and further financing of Fleet after the Stantons filed for bankruptcy did not amount to creation of a new lien.

We affirm the decision of the BAP.

## Analysis

■ We review a bankruptcy court's decision to grant a motion for summary judgment *de novo*.[3]

### 1. The Trustee's Appeal

The Stantons owned all the stock of Fleet, but there has been no finding and no contention that Fleet was a sham or alter ego or that the corporate veil ought to be pierced for any reason. Thus for purposes of this appeal, Fleet is a separate person from the Stantons. The Stantons went bankrupt, not Fleet Manufacturing. The trustee in bankruptcy sold the Stantons' house. This appeal is a dispute between the trustee in the Stantons' bankruptcy and the factor over which is entitled to the proceeds from that sale.

■ The trustee's theory was that it was entitled to avoid International Factors' mortgage lien on the house, because the lien secured advances International Factors made to Fleet after the Stantons' bankruptcy petition. The Bankruptcy Appellate Panel correctly ruled that the lien could not be avoided, because it was created when the Stantons mortgaged their house, not when the advances were made, and Fleet did not need court approval to advance additional money after the Stantons filed for bankruptcy, because the advances were to Fleet, which did not file for bankruptcy.

■ The trustee argues that the automatic stay provision, 11 U.S.C. § 362, applied and prohibited the factor's advances to Fleet.[4] Violation of the automatic stay is a serious business, exposing the violator in some circumstances to punitive damages and sanctions for contempt.[5] Banks and other lenders may well tremble at the notion that they and possibly their officers could face such severe sanctions if they lend money to a corporation one of whose shareholders has gone bankrupt. Many close corporations, such as small manufacturers and professional practices, secure debt with shareholders' property as well as corporate property. Shareholders some-

---

1. *Beeler v. Stanton (In re Stanton)*, 239 B.R. 222, 235 (Bankr.E.D.Wash.1999) ("*Stanton I*").

2. *Stanton II*, 248 B.R. at 831.

3. *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 578 (9th Cir.1998).

4. *See* 11 U.S.C. § 362(a) (1994).

5. 11 U.S.C. § 362(h) (1994) ("An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."); 11 U.S.C. § 105(a) (1994) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *see also Computer Communications, Inc. v.Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 731 (9th Cir. 1987); *United States v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756, 767 (9th Cir.1994).

times *go* bankrupt while the corporation continues as a financially healthy business.

Section 362(a)(4) does not apply. That subsection stays any "act to create, perfect or enforce any lien against property of the estate."[6] A loan of money to a debtor *not* in bankruptcy does none of those things, as the Bankruptcy Appeals Panel majority stressed.[7] A business relationship of stock ownership does not *ipso facto* extend the automatic stay to non-bankrupts. The lien against the Stantons' house was created when they gave the factor a second mortgage, prior to the bankruptcy filing. That was a conveyance of an interest in real property, namely, a lien. The subsequent advances merely affected how much money the lien secured.

■ As the Bankruptcy Appellate Panel recognized, 11 U.S.C. § 364(c) is therefore beside the point. It enables the trustee in bankruptcy to encumber assets of the estate with court approval.[8] The reason this is beside the point is that the Stantons' house was encumbered *before* the bankruptcy, and International Factors did not lend any money to the Stantons. As the Bankruptcy Appellate Panel observed, following the Stantons' Chapter 11 petition, the bankruptcy estate included the house "subject to the existing liens, which includ-

ed the lien created by the prepetition trust deed."[9] International Factors thus loaned the money to a going, non-bankrupt corporation in which the Stantons owned stock. Fleet did not need court approval to incur debt because Fleet was not in bankruptcy. The Stantons would have needed court approval to incur additional secured debt, but they did not incur any additional secured debt. Were we to hold that Fleet needed court approval, we would be piercing the corporate veil, and there is no justification for piercing it.[10]

■ [5] The factor's lien on the house did not arise anew each time the factor made an advance. The deed of trust secures "any and all indebtedness of … Fleet Manufacturing Company, Inc …. incurred at any time in the future." Factors have traditionally used such boilerplate future advances clauses because they are practical.[11] Osborne has a particularly lucid explanation of the practicalities:

> There are many transactions in which business desirability is heavily on the side of a mortgage securing not only a presently created or preexisting debt but future obligations as well … [such as] fluctuating current balances under lines of credit established with the mortgagee…. The mortgagor saves interest

---

6. 11 U.S.C. § 362(a)(4) (1994).

7. *Stanton II*, 248 B.R. at 829("Here, Debtors, in their role as trustee, were not seeking to obtain credit or incur debt. Indeed, the factoring agreement between [the factor] and Fleet and the perfection of [the factor]'s lien rights had all occurred prepetition. Therefore,[the factor]'s postpetition advances to Fleet did not constitute the extension of credit to Debtors or the incurrence of debt by Debtors. Instead, [the factor] provided credit to Fleet, which effectively increased the encumbrance on the Property in accordance with [the factor]'s contractual rights and perfected lien on the Property.").

8. 11 U.S.C. § 364(c) (1994).

9. *Stanton II*, 248 B.R. at 827.

10. The dissent suggests that the bankruptcy court should not have "permitted *Fleet* to incur additional debt secured by liens on debtors' estate under § 364(c)." Dissent at 13929 (emphasis added). As the BAP recognized, this suggestion elides the important point that neither Fleet nor the factor had the right to bring a § 364(c) request as a trustee in the Stantons' bankruptcy proceeding. *See Stanton II*, 248 B.R. at 829–30.

11. *See* 2 Grant Gilmore, *Security Interests in Personal Property*, § 35.2 (1965); George Osborne, *Mortgages* §§ 113, 114 (2d ed.1970).

on the surplus until ready to use it and escapes the burden of proper investment of it for the interim. He also avoids the expense and inconvenience of refinancing the mortgage so as to include the additional needed sum, or, in the alternative, of executing second and later mortgages for each new advance with attendant higher interest rates and financing charges. ... The mortgagee, on his part, minimizes the bother and costs of frequent financing (which even though not borne by him tend to discourage borrowing).... [T]he conveyance of the interest in the property, made when the transaction is first entered into, is not a piecemeal affair but is intended to stand as security from the outset for the entire performance by the mortgagor of this one promise.[12]

If it were correct that Washington law refused recognition to the traditional future advances clauses, and treated each subsequent advance as a new lien, a different analysis would apply. But as the Bankruptcy Appellate Panel correctly held, Washington law is to the contrary. *John M. Keltch, Inc. v. Don Hoyt, Inc.*[13] holds that "a mortgage for future advances becomes an effective lien as to subsequent encumbrances from the time of its recordation, rather than from the time when each advance is made."[14]

This does not necessarily mean that International Factors wins all the marbles.

Under *John M. Keltch*[15] and under *National Bank of Washington v. Equity Investors, Inc.*,[16] it would matter that the factor had discretion whether to make the subsequent advances to Fleet, and was not obligated to do so. *National Bank of Washington* holds that "where the advances of promised loan moneys are, under an agreement to lend money, largely optional ... liens attaching prior to an optional advance would thus be superior to it."[17] This does *not* mean that when International Factors loaned money to Fleet after the Stantons went bankrupt, a *new lien* was created on the Stantons' house. If *National Bank of Washington* is still good law, it would mean that when these optional advances to Fleet were made, the factor's lien on the house, to the extent of these subsequent advances, was junior to the priority of intervening claims. *National Bank of Washington* thus would affect the *priority* of an optional lien but would not change the *existence* of the lien itself.

Following a 1973 amendment to the lien priority statute in the mechanics' lien chapter, it may be that *National Bank of Washington* is either limited in the mechanics' lien context or entirely abrogated.[18] But the parties neither briefed this issue nor addressed it in their argument to us. We thus need not reach the question whether any advances made post-petition

**12.** Osborne, *Mortgages* §§ 113, 114.

**13.** 4 Wash.App. 580, 483 P.2d 135 (1971).

**14.** *Id.* at 136.

**15.** *Id.*

**16.** 81 Wash.2d 886, 506 P.2d 20 (1973) (en banc).

**17.** *Id.* at 29.

**18.** *See* RCW 60.04.226. *Compare* Comment, *Mechanics' Liens: The "Stop Notice" Comes to Washington,* 49 Wash. Law Review 685

(1974) (in the case of *mechanics* liens, the optional advances rule no longer applies); *and* William B. Stoebuck, 18 Wash. Pract. Real Estate: Transactions § 17.25 (2002 Pocket Part) ("On its face, the section is not limited to construction mortgages, but, because it was originally enacted as a package with the stop-notice statute, which specifically applies to construction lenders, it might be argued that future-advances mortgages for other purposes are not within its intent.").

are subordinate to intervening claims, and we leave that to the bankruptcy court to determine if necessary on remand.

The factor's lien preexisted the bankruptcy. No one violated the automatic stay provision. Neither the factor nor Fleet manufacturing needed court permission for the factor to advance additional money to Fleet. To hold otherwise would allow the bankruptcy of a corporation's shareholder to clog the going business of the corporation and its creditors. The bankruptcy at most affected the priority of the factor's security interest, but not its existence.[19]

### 2. The Factors' Cross–Appeal

The Bankruptcy Appellate Panel remanded to the bankruptcy court for a determination of how much of the sale proceeds from the Stantons' house should go to each party. International Factors cross-appeals this remand on the ground that the amount they were owed on the date of the bankruptcy filing exceeded the sale proceeds, so they should get all the proceeds and no remand is needed.

The BAP held that because the bankruptcy court did not address the validity of International Factors' lien under § 506(d), it would not make that determination for the first time on appeal. The BAP remanded, advising the bankruptcy court to address not only the §§ 502 and 506 argu-

ments but also "other claims that remain unresolved."[20] Despite Jewell's argument to the contrary, because the bankruptcy court did not make these determinations in the first instance, the remand was not erroneous.

AFFIRMED.

GOULD, Circuit Judge, dissenting:

I would reverse the decision of the Bankruptcy Appellate Panel ("BAP") and reinstate the bankruptcy court's order granting summary judgment to the trustee. The majority errs by misinterpreting Washington lien law and then misapplying federal bankruptcy law based on its erroneous interpretation of Washington law. Based on my view of applicable law, I regret I cannot join my colleagues, and instead I respectfully dissent from the majority's opinion.

### I

Kevin and Maryann Stanton ("debtors") owned all the shares of a business called Fleet Manufacturing ("Fleet"), which was organized as a closely held corporation. To finance Fleet, debtors and Fleet[1] entered several agreements with International Factors, Inc. ("creditor"), including a Recourse Factoring, Short–Term Financing, & Security Agreement ("Factoring Agreement"), a Continuing Guaranty and Waiver ("Guaranty"), and a Deed of Trust

---

**19.** The dissent says "debtors' continued use of their house as collateral for Fleet's debts on new advances resulted in their incurring new and increased liability", Dissent at 13928, and "they could not encumber [their house] after filing for bankruptcy without obtaining court approval." Dissent at 946 n. 4. Once people have mortgaged their house, it really isn't up to them whether to "continue use of their house as collateral." It already is collateral. The Stantons did not "encumber" it after filing for bankruptcy. They encumbered it prior to bankruptcy, when they gave the factor a lien on it. The Stantons didn't do anything affecting the lien after bankruptcy and

the factor didn't do anything without court approval to create or perfect the lien (it had already been created and perfected before the bankruptcy). The factor loaned Fleet, a separate person from the Stantons, more money after bankruptcy, which affected the amount secured by the preexisting lien.

**20.** *Stanton II*, 248 B.R. at 831.

**1.** Debtors signed most of the agreements as representatives of Fleet; however, debtors signed the Deed of Trust and the Guaranty on their own behalf, as guarantors.

and Security Agreement ("Deed of Trust"). The Factoring Agreement provides that creditor will buy Fleet's accounts receivable at a discount, as requested by Fleet, subject to creditor's deeming the accounts acceptable in its sole discretion. The Factoring Agreement was signed on April 22, 1994. Also on April 22, 1994, debtors signed the Guaranty, under which they agreed to be held personally liable for Fleet's debts to creditor. On July 28, 1994, debtors signed the Deed of Trust on their home, which assigned a security interest in the home to creditor.[2] It was recorded on July 29, 1994. The Deed of Trust provides that it is created to secure debtors' and Fleet's obligations under the Guaranty and the Factoring Agreement.

On September 30, 1994, debtors filed a petition for Chapter 11 bankruptcy. On May 11, 1996, the bankruptcy proceeding was converted to Chapter 7. The trustee sold the debtors' residence, and creditor sought to attach the proceeds of the sale, based on the lien allegedly created by the Deed of Trust. On September 26, 1996, the trustee filed this action, seeking to avoid liens based on post-petition transfers. Both sides filed motions for summary judgment. The bankruptcy court, I believe correctly, granted trustee's motion. *Beeler v. Stanton (In re Stanton)*, 239 B.R. 222, 235 (Bankr.E.D.Wash.1999) ("*Stanton I*").

The BAP reversed, with one judge dissenting. *Jewell v. Beeler (In re Stanton)*, 248 B.R. 823, 831 (9th Cir. BAP 2000) ("*Stanton II*"). The BAP majority held that, because a lien to secure future advances is established at the time of recording under Washington law, the lien itself was created before both the Chapter 11 petition for bankruptcy and the conversion

of the proceeding to Chapter 7. The BAP majority also held that the encumbrances did not violate 11 U.S.C. § 364 because they were for Fleet's benefit rather than to aid debtors and therefore were not within the scope of § 364. Because the BAP misinterpreted Washington law and because the post-petition advances to Fleet further encumbered the debtors' estate in violation of § 364, I would reverse the BAP majority and reinstate the initial decision of the bankruptcy court, agreeing with the position with the BAP dissent. I respectfully submit that the majority errs in failing to do so.

## II

### A. Debtors' Post-petition Encumbrances Violated 11 U.S.C. §§ 362 and 364.

As the bankruptcy court here recognized, once a debtor files for bankruptcy, he or she loses the right further to encumber the assets of the bankruptcy estate and may do so only with the permission of the bankruptcy court. *See Snyder v. Dewoskin (In re Mahendra)*, 131 F.3d 750, 755(8th Cir.1997). The "bankruptcy estate consists of all of the debtor's legal and equitable property interests that existed as of the time that the bankruptcy petition [was] filed." *Id.* (citing 11 U.S.C. § 541(a)(1)). It is beyond dispute that debtors' house was part of the bankruptcy estate and could not be further encumbered after debtors filed for bankruptcy. The only questions, then, are whether creditor's post-petition advances to Fleet further encumbered debtors' house and whether, under Washington law, creditor's post-petition advances created new liens.

Section 362[3] provides that, after a debtor files for bankruptcy, an automatic stay

---

**2.** The Deed of Trust provides that debtors' filing for bankruptcy would be considered a default on the agreement. This implies, contrary to the majority's view, that the creditor

well knew that debtors could not perform fully in event of their bankruptcy.

**3.** The majority does not give adequate scope and respect to § 362. The parties' main dis-

goes into effect prohibiting, among other actions, "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). Section 364(c) provides a limited exception to § 362(a)(4). Specifically, § 364(c) allows the bankruptcy court, "*after notice and a hearing*," to authorize the "obtaining of credit or the incurring of debt" secured by a lien when necessary to provide the trustee with the funds to pay administrative expenses. 11 U.S.C. § 364(c)(2), (3) (emphasis added); *see also* 11 U.S.C. § 364(d) (allowing the court to authorize senior and equal liens on encumbered property in certain circumstances).

### 1. Section 364's Exception to Automatic Stay Did Not Apply.

Creditor argues, and the majority holds, that § 364 does not require court approval in these circumstances because the debt was incurred by Fleet, a non-bankrupt entity, rather than by debtors. Thus, according to the majority and creditor, there was no new lien, just a prior lien that had existed from the outset of the guarantee relationship, before the bankruptcy. Though this argument has some force, it cannot be squared with the protective purposes of § 364 to safeguard the debtors'

estate, nor with the pertinent definition of "debt" that controls whether creditor needed bankruptcy court permission to increase debtors' liability after the bankruptcy petition was filed.

I agree with the well-reasoned analysis of Judge Perris, the BAP dissenter. As she recognized, § 364(c) barred the debtors' attempt to use their house as collateral without prior court approval because, in continuing to use their house as collateral for Fleet's debts on post-petition advances, the debtors "incurr[ed] debt" within the meaning of § 364(c). The bankruptcy code defines "debt" as "liability on a claim" and defines "claim" as either a "right to payment" or to "an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(12), (5). It is difficult, if not impossible, to dispute that the debtors' continued use of their house as collateral for Fleet's debts on new advances resulted in their incurring new and increased liability on creditor's lien claim, an equitable remedy, against debtors as guarantors, for breach of performance by Fleet on its obligations arising after the petition was filed.[4] To increase the amount of the liens was to increase liability on a claim, and, as such, creditor's actions increasing debtors'

---

pute concerns the interpretation of § 364, an adjunct of § 362. As explained above, § 364, which permits the court to authorize a trustee to acquire secured credit in some circumstances, is properly viewed as an exception to § 362, which generally prohibits post-petition encumbrances on the bankruptcy estate. In other words, the affirmative, but limited, authorization of § 364 would have little meaning if § 362 did not operate as a general bar to obtaining secured credit and thereby further encumbering a bankruptcy estate. The majority does not recognize that it makes little sense to interpret § 364 without due weight to § 362.

4. The majority implies that my approach would pierce the corporate veil without warrant to conclude that debtors violated §§ 362 and 364 by further encumbering their house after filing for bankruptcy. But the debtors'

house was part of the bankruptcy estate; it follows that they could not encumber it after filing for bankruptcy without obtaining court approval.

Those who file for bankruptcy receive considerable advantages, namely the discharge of their debts. In exchange, the debtor's estate after filing is protected against encumbrance except as provided in the bankruptcy laws. The fact that debtors' estate was encumbered on behalf of or with aim to benefit another entity, *i.e.*, their closely held corporation, rather than on their own behalf, does not change the fact that it was incorrect further to encumber the estate of the bankrupt without court approval in violation of the bankruptcy laws. Policy arguments about the import of maintaining strong corporate finances and the legal tenet that corporations have separate identities from those of their officers do not enter into the equation. *See Stanton II,*

liability required prior court approval, which was not obtained. *See Stanton II,* 248 B.R. at 832 (Perris, J., dissenting).

The majority argues, in note 18, that debtors did not "encumber" their property after bankruptcy filing because there was a preexisting lien. But the majority proceeds on the mistaken assumption that Washington law does not create a new lien when optional advances were made by the factor to Fleet after the debtors' bankruptcy. *See* II. B. *infra.* These optional advances increased "debt" of the debtors and further encumbered the bankruptcy estate.

The majority errs by interpreting § 364 without reference to the definitions of "debt" and "claim" in the bankruptcy code. These definitions were drafted to provide clarity in difficult cases such as this one, where it would not otherwise be clear whether a substantive section of the code had been violated. The majority misinterprets § 364 because it views it in isolation, without reference to these definitions that control the mandatory scope of §§ 362 and 364.

Because there was no hearing for court approval of increased debt under § 364, creditor cannot argue that, after notice and a hearing, the bankruptcy court permitted Fleet to incur additional debt secured by liens on debtors' estate under § 364(c). *See, e.g., Thompson v. Margen (In re McConville),* 110 F.3d 47, 50 (9th Cir.1997) (discussing the requirements of § 364(c)). The further encumbrance of

debtors' estate does not come within § 364's limited exception to the automatic stay provided for under § 362(a). The controlling issue is whether the further encumbrance of the bankruptcy estate after the debtors filed their petition for bankruptcy violated § 362(a). I would hold that it did.

### 2. Section 362 Was Violated.

The language of § 362(a), as quoted above, is broad. It provides for an automatic stay "applicable to all entities, of . . . (4) any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a); *see also Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.,* 884 F.2d 80, 84–85 (3d Cir.1989). The stay is "effective immediately upon the filing of the petition" and "[f]ormal service of process is not required." 3 *Collier on Bankr.* ¶ 362.11 (15th ed. rev.2001). The stay may be violated knowingly or unknowingly, *id.,* and we have explicitly held "that violations of the automatic stay are void, not voidable." *Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 571 (9th Cir. 1992).

Because it is undisputed that the debtors' house was part of their bankruptcy estate, liens on the house that were created or perfected after the filing of the bankruptcy petition are void under *In re Schwartz.*[5] However, because the Deed of Trust was signed two months before the filing of the bankruptcy petition, creditor argues, and the majority agrees, that any

---

248 B.R. at 833 (Perris, J., dissenting) ("There is no piercing the corporate veil here. [Creditor] agreed to secure its future advances to Fleet with assets that did not belong to Fleet. Far from piercing the corporate veil, [this] approach simply holds[creditor] to the consequences of the agreement into which it entered.")

**5.** The bankruptcy court explicitly found that all pre-petition debts to creditor had been fully paid. *Stanton I,* 239 B.R. at 228; *see*

*also Stanton II,* 248 B.R. at 826. Although creditor vigorously avers that the amount that Fleet owes creditor has not dropped down to zero since the bankruptcy petition was filed, creditor does not dispute the findings of the bankruptcy court as to this issue. Because creditor continuously made advances to Fleet, the fact that the balance owed to creditor was never zero is not inconsistent with the fact that all pre-petition debt was paid in full and the disputed lien challenged by the trustee reflects liability for post-petition funding.

liens based on its post-petition advances to Fleet were created and perfected before the automatic stay and, therefore, that § 362(a) was not violated.[6] It is true that pre-petition liens are not affected by an automatic stay. *See Equibank, N.A.,* 884 F.2d at 84. However, as the majority recognizes, when the liens were created is an issue that must be resolved under state law. *See id.* at 84–85. Considering state law and its intersection with the federal bankruptcy code, I conclude that the liens at issue arose post-petition under Washington law. This issue warrants explication.

### B. The Liens Arose Post-petition Under Washington Law.

Under Washington law, liens based on optional advances take effect at the time of each advance.[7] *See Nat'l Bank of Wash. v. Equity Investors,* 81 Wash.2d 886, 506 P.2d 20, 29–30 (1973); *cf. John M. Keltch, Inc. v. Don Hoyt, Inc.,* 4 Wash.App. 580, 483 P.2d 135, 137–38 (1971) (holding that liens based on mandatory advances are effective at the time of recordation).[8] The language in the Factoring Agreement makes the advances wholly optional: "[Creditor] is not obligated to buy any account from [Fleet], and reserves the right to decline to purchase any Account that [creditor] deems unacceptable in its sole discretion." Moreover, creditor admitted in the reply brief that creditor "was not required to make advances." Under Washington law, a new lien arose at the time of each advance.[9] The new liens on the debtors' estate to secure new advances

6. Debtors filed for bankruptcy on September 30, 1994; they had signed the Deed of Trust on July 28, 1994 and recorded it on July 29, 1994.

7. The majority attempts to distinguish between the priority given to a lien under Washington law and the attachment of the lien under state law, apparently because Washington cases use the term "priority" in discussions of liens based on optional advances and because making such a distinction provides necessary support for the majority's holding. However, nowhere does the case law distinguish between the priority to be given to a lien and the date that it attaches, and there is simply no basis to conclude that such a distinction exists, particularly in light of the axiom that the priority of a lien is determined by the date of its attachment or perfection by recordation. *See, e.g., Black's Law Dictionary,* 935 (7th ed.1999) (defining "priority lien"); *see also Nat'l Bank of Wash. v. Equity Investors,* 81 Wash.2d 886, 506 P.2d 20, 29–30 (1973); *Cedar v. W.E. Roche Fruit Co.,* 16 Wash.2d 652, 134 P.2d 437, 441–42 (1943).

8. The majority reads *John M. Keltch, Inc.* for the proposition that, even in the case of liens based on optional advances, the lien is created at the time of recordation of the security agreement, rather than at the time of each optional advance. 303 F.3d at 943. *John M.*

*Keltch, Inc.* merely stands for the proposition that, where advances are mandatory under the contract at issue, the lien takes effect at the time of recordation. I do not dispute that principle. Yet *Keltch* clearly recognizes that a different rule applies as to when the lien becomes *effective* when the lien is based on optional advances:

> By the weight of authority, a mortgage for future advances becomes an effective lien ... as to subsequent purchasers and encumbrancers, from the time of its recordation, rather than from the time when each advance is made, where the making of the advances is obligatory upon and not merely optional with the mortgagee.

*John M. Keltch, Inc.,* 483 P.2d at 138(citations and internal quotation marks omitted; ellipsis in original). The different rule applied for optional advances was also explicitly recognized in *Equity Investors,* upon which I also rely. *Equity Investors,* 81 Wash.2d 886, 506 P.2d 20, 29–30.

9. Section 60.04.226 of the Washington Revised Code, on which the BAP relied, is not to the contrary. Section 60.04.226 relates to mechanics' and materialmen's liens. *See generally* Wash. Rev.Code ch. 60.04. No mechanic's or materialman's lien is at issue here. In contrast to the explicit limitations of section 60.04.226, the common law optional advances rule has been applied broadly, be-

to Fleet after the bankruptcy proceeding was commenced required approval by the bankruptcy court that had protective jurisdiction over the debtors' estate.

## C. Section 348(d) Does Not Trigger a New Automatic Stay Under § 362(a).

Creditor nonetheless urges that, because 11 U.S.C. § 348(d) provides that claims which arise before the conversion of a bankruptcy case from Chapter 11 to Chapter 7 are to be treated as pre-petition claims, § 362(a) was not violated.[10] In other words, in creditor's view, any violation of the automatic stay instituted in the Chapter 11 case becomes irrelevant once the case is converted to Chapter 7. I find the court's analysis in *Johnson v. Garden State Brickface & Stucco Co.*, 150 B.R. 617, 619 (E.D.Pa.1993), to be persuasive. In *Johnson*, the court held that the conversion of a case from Chapter 11 to Chapter 7 did not affect the automatic stay imposed under § 362(a) and that, "[i]f Congress had intended a conversion to affect the automatic stay provision, it clearly could have so stated." *Id.*

The Eleventh Circuit in *British Aviation Ins. Co. v. Menut (In re State Airlines, Inc.)*, 873 F.2d 264, 268–69(11th Cir. 1989), provided a comparable analysis. Recognizing that "[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws," *In re State Airlines, Inc.*, 873 F.2d at 268 n.

8(internal quotation marks and citations omitted), the Eleventh Circuit declined to "perform lexigraphic gymnastics and effectively rewrite [§ ] 362," as would be necessary to hold, based on § 348(d), that a conversion from one chapter to another triggers a new automatic stay. *Id.* at 268. The Eleventh Circuit further noted that

almost every provision that details the effect of a conversion does so with respect to the order for relief. The only provision that does address the petition, [§ ] 348(a), expressly states that the date of the petition remains *unchanged.* We believe that it would be dangerous and unwarranted for us to substitute freely terms that Congress used deliberately.

*Id.* at 269.

I would adopt the reasoning of the *Johnson* court and the Eleventh Circuit. Notwithstanding § 348(d), the conversion of the case from Chapter 11 to Chapter 7 has no effect on our analysis under § 362(a). The purpose and terms of § 362(a) apply in a Chapter 11 reorganization as well as in a Chapter 7 liquidation. The mere fact of a conversion from Chapter 11 to Chapter 7 cannot rescue an increased debt that offended the automatic stay of § 362(a) during the Chapter 11 proceeding. Because the continued encumbrance of the bankruptcy estate after debtors had filed their Chapter 11 petition violated the automatic stay provided for in § 362(a), the liens created by creditor's optional ad-

---

yond the realm of construction liens. *See, e.g., Cedar v. W.E. Roche Fruit Co.*, 16 Wash.2d 652, 134 P.2d 437, 441–43 (1943). Even if section 60.04.226 abrogates the optional advances rule as to construction liens, there is no reason to think that it *generally* abrogates the optional advances rule in all contexts. Until the Washington Supreme Court or the state legislature changes the optional advances rule, it remains in effect in Washington outside of the construction lien context.

**10.** Section 348(d) provides that

A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348(d).

vances are void under our decision in *In re Schwartz.* I would reverse the decision of the BAP majority and affirm the order of the bankruptcy court granting trustee's motion for summary judgment.